[Cite as *In re L.T.*, 2016-Ohio-5272.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY


IN RE: L.T.

 :

 :

 :

 :

CASE NOS. CA2016-03-048
     CA2016-03-058

O P I N I O N
8/5/2016


APPEAL FROM BUTLER COUNTY COURT OF COMMON PLEAS
JUVENILE DIVISION
Case No. JN2012-0458


Jonathan Ford and Kate Nolan, 10 Journal Square, 3rd Floor, Hamilton, Ohio 45011, Guardian Ad Litem

Scott N. Blauvelt, 246 High Street, Hamilton, Ohio 45011, for appellant, J.T.

Seth A. Cantwell, 240 East State Street, Trenton, 45067, for appellant, C.A.S.

Michael T. Gmoser, Butler County Prosecuting Attorney, Government Services Center, 315 High Street, 11th Floor, Hamilton, Ohio 45011, for appellee

Dawn Garrett, 9435 Waterstone Boulevard, Suite 140, Cincinnati, Ohio 45249, for T.N.G.


 **M. POWELL, P.J.**

 **{¶ 1}** Appellant, J.T. ("Father"), appeals from the judgment of the Butler County Court of Common Pleas, Juvenile Division, awarding permanent custody of his minor child, L.T., and L.T.'s half-sister, N.G., to the Butler County Department of Job and Family Services ("the Agency"). Appellant, C.S. ("C.S."), who is Father's mother, L.T.'s paternal grandmother, and

L.T.'s and N.G.'s former temporary custodian, appeals from the same judgment, which denied her motion for legal custody of L.T. and N.G. The appeals have been consolidated for review. For the reasons that follow, we affirm the judgment of the juvenile court.

**{¶ 2}** N.G. was born in 2008 and is the child of T.G. ("Mother") and D.W.[1] L.T. was born in 2010 and is Father's biological child. Although N.G. is not Father's biological daughter, they enjoy a father-child relationship.

**{¶ 3}** On September 1, 2012, the Agency removed N.G. and L.T. from Mother's home because the home was without electricity and food and was infested with bugs, and Mother had reported she was bi-polar and learning-disabled. The Agency filed a complaint alleging the children were neglected and dependent. The children were placed in the temporary custody of C.S. and began living in her home where Father was also living. On February 19, 2013, the children were adjudicated dependent after Mother and Father stipulated to the facts in the Agency's complaint.

**{¶ 4}** Several case plans were adopted for the children's parents throughout the pendency of the case. Father did not initially participate in the case plan services because he sought to have custody granted to C.S. However, on January 7, 2014, the order granting C.S. temporary custody of the children was terminated and the children were placed in the temporary custody of the Agency. Subsequently, the Agency placed the children with a foster family, where they have remained for the duration of the case. Temporary custody with C.S. was terminated due to a series of incidents indicating that C.S.'s home was not a safe environment. These incidents consisted of (1) N.G. sustaining a half-inch cut on her scalp when C.S.'s other son, and Father's half-brother, J.S., threw a cigarette lighter, striking N.G.; (2) N.G. sustaining swelling and bruising to her face and a black eye when J.S. threw a

---

1. Neither Mother nor D.W. appealed the juvenile court's decision awarding the Agency permanent custody of their children and terminating their parental rights, and thus neither is a party to this appeal.

cup that ricocheted off a wall, striking N.G.; (3) a domestic violence incident in the driveway of C.S.'s home where C.S. was slashed on her head and hand with a knife while she was fighting with her nephew, his girlfriend, and three other friends of the nephew, causing C.S. wounds that required staples and stitches; (4) J.S. becoming involved in the fight and being arrested; (5) another relative residing in the home overdosing on drugs; and (6) yet another relative overindulging in alcoholic beverages and passing out. There were also concerns that C.S. was abusing alcohol and her prescription medications.

{¶ 5} Relative placements were investigated and home studies were ordered on those potential placements. However, none of the relatives who had home studies performed on their residences moved for legal custody of N.G. and L.T.

{¶ 6} After temporary custody with C.S. was terminated and the children were placed in foster care, Father sought custody of the children and began utilizing case plan services. Under the case plan services, Father was required to complete a psychological evaluation and comply with the recommendations stemming from the evaluation, complete parenting classes, and join a father's support group if he were to obtain custody of the children. A caseworker for the Agency assigned to the family also recommended that Father undergo individual counseling, but Father refused, saying that he did not need it.

{¶ 7} Father visited with the children regularly and consistently and the visits went well. Father engaged in and completed the Development of Living Skills ("DLS") parenting program, attending 58 sessions between April 2014 and March 2015. The DLS instructor expressed the opinion that Father was a capable parent for the children. However, the instructor also testified she was concerned about the fact that Father did not maintain independent housing and "relied upon other people for income at times[.]" The instructor estimated that the percentage of time Father relied on other people for his income was "probably in the high nineties."

{¶ 8}    At the time of the permanent custody hearing, Father was residing with C.S., as he has for most of his life, and where he intends to remain.  Shortly after the permanent custody hearing commenced, Father became employed as a forklift operator at Menard's at $8.85 per hour.  Initially, Father was working 48 hours per week, but his hours were cut back to 30 hours per week.

{¶ 9}    The Agency moved for permanent custody of the children in September 2014 but later withdrew its motion.  C.S. moved for legal custody of the children in November 2014.  Thereafter, the Agency moved for permanent custody of the children on February 9, 2015.  Hearings were held on the Agency's motion for permanent custody and C.S.'s motion for legal custody between March 30, 2015, and July 6, 2015.  During one of the hearings, Mother testified she was no longer seeking custody of N.G. and L.T. and that she wanted legal custody to be awarded to either Father or C.S.

{¶ 10}    On September 15, 2015, the magistrate issued a decision recommending that the Agency be awarded permanent custody of the children and that C.S.'s motion for legal custody be denied.  The magistrate determined that C.S. was not an appropriate placement for the children because the incidents that occurred at her home while she was the children's temporary custodian indicated she was unable to protect the children.  The magistrate also determined that Father was not an appropriate custodian for the children because he resides in C.S.'s home and has not demonstrated a current ability to parent the children.

{¶ 11}    Father and C.S. filed objections to the magistrate's decision.  On February 25, 2016, the juvenile court overruled the objections and adopted the magistrate's decision as the order of the court.

{¶ 12}    Father now appeals from the judgment of the juvenile court and assigns the following as error:

{¶ 13}    Assignment of Error No. 1:

{¶ 14}   THE TRIAL COURT ERRED IN GRANTING PERMANENT CUSTODY AND TERMINATING APPELLANT'S PARENTAL RIGHTS WHERE THAT DECISION WAS NOT SUPPORTED BY CLEAR AND CONVINCING EVIDENCE AND WAS CONTRARY TO THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 15}   Assignment of Error No. 2:

{¶ 16}   THE TRIAL COURT ERRED IN GRANTING PERMANENT CUSTODY PURSUANT TO R.C. 2151.414(B)(1)(d).

{¶ 17}   C.S. appeals from the same judgment and assigns the following as error:

{¶ 18}   THE TRIAL COURT ERRED IN GRANTING PERMANENT CUSTODY AND DISMISSING APPELLANT'S LEGAL CUSTODY MOTION WHERE THAT DECISION WAS NOT SUPPORTED BY CLEAR AND CONVINCING EVIDENCE AND WAS CONTRARY TO THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 19}   Before a natural parent's constitutionally protected liberty interest in the care and custody of his or her child may be terminated, the state is required to prove by clear and convincing evidence that the statutory standards for permanent custody have been met. *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388 (1982).  "Clear and convincing evidence" is evidence that will produce in the mind of the trier-of-fact a firm belief or conviction as to the facts sought to be established.  *Cross v Ledford*, 161 Ohio St. 469, 477 (1954).  An appellate court's review of a juvenile court's decision granting permanent custody is limited to considering whether sufficient credible evidence exists to support the juvenile court's determination.  *In re M.B.*, 12th Dist. Butler Nos. CA2014-06-130 and CA2014-06-131, 2014-Ohio-5009, ¶ 6.  A reviewing court will reverse a finding by the juvenile court that the evidence was clear and convincing only if there is a sufficient conflict in the evidence presented.  *Id.*

{¶ 20}   Pursuant to R.C. 2151.414(B)(1), a juvenile court may terminate parental rights

and award permanent custody to a children services agency if the court makes findings pursuant to a two-part test. First, the court must find that the grant of permanent custody to the agency is in the best interest of the child, utilizing, in part, the factors of R.C. 2151.414(D)(1). *Id.* Second, the court must find that any of the following factors or conditions apply: (1) the child is abandoned; (2) the child is orphaned; (3) the child has been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period; (4) where the preceding three factors do not apply, the child cannot be placed with either parent within a reasonable time or should not be placed with either parent; or (5) the child or another child in the custody of the parent from whose custody the child has been removed, has been adjudicated an abused, neglected, or dependent child on three separate occasions. R.C. 2151.414(B)(1)(a)-(e).

{¶ 21} R.C. 2151.414(D)(1) provides that in considering the best interest of a child in a permanent custody hearing:

> [T]he court shall consider all relevant factors, including, but not limited to the following:
>
> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
>
> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
>
> (c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period * * *;
>
> (d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of
this section apply in relation to the parents and child.

{¶ 22} In his first assignment of error, Father argues the juvenile court erred by granting permanent custody of N.G. and L.T. to the Agency because the decision was not in the children's best interest and there were "legally secure placement alternatives" to awarding the Agency permanent custody, including reunifying the children with him or awarding C.S. legal custody of the children. Although Father acknowledges he appealed the juvenile court's decision only with regard to L.T., his biological child, he requests that we consider his arguments on appeal as applying to N.G. as well, because the evidence establishes that a close father-child relationship exists between him and N.G. even though he is not N.G.'s biological father.

{¶ 23} Initially, as to both of Father's assignments of error, Father lacks standing with regard to N.G. because he is not her biological father, he did not seek legal custody of N.G., and he has appealed only the grant of permanent custody relating to L.T. *See In re J.P.*, 12th Dist. Butler Nos. CA2015-08-160 and CA2015-08-161, 2016-Ohio-7, ¶ 8 (nonparent who seeks legal custody of a child must file a motion for legal custody pursuant to R.C. 2151.353[A][3]); *In the Matter of Neff*, 3d Dist. Allen No. 1-78-9, 1978 WL 215720, *2 (child's stepfather is not a party unless designated as a party by the court and thus lacked standing to appeal permanent custody order); *In re A.L.A.*, 11th Dist. Lake Nos. 2011-L-020 and 2011-L-021, 2011-Ohio-3124, ¶ 2 (stepfather has no parental rights and thus lacks standing to appeal permanent custody order). We note, however, that Father supports C.S.'s appeal of the juvenile court's denial of her motion for legal custody of N.G. and L.T.

{¶ 24} As to the best-interest factor in R.C. 2151.414(D)(1)(a), the evidence shows that prior to the filing of the Agency's initial complaint in September 2012, there had been a history of allegations of abuse and neglect of the children that went as far back as shortly

after N.G.'s birth in 2008. The allegations included instances of physical abuse, medical neglect, and unsanitary conditions at the home.

{¶ 25}    The children were in C.S.'s temporary custody from September 1, 2012, until January 7, 2014. During that time, the children and Father lived together in C.S.'s home, and Mother regularly visited with the children. The record shows that L.T. and N.G. are bonded with Mother, Father, and C.S. There were a number of other relatives living in C.S.'s home during this period, including C.S.'s other son and Father's half-brother, J.S. J.S. is developmentally delayed and consequently receives income from Social Security.

{¶ 26}    In the fall of 2013, J.S. became angry at C.S. and threw a cigarette lighter that struck N.G. in the head, causing a half-inch cut on the child's scalp. Emergency service personnel had to be called to treat the wound. On another occasion, J.S. threw a cup that ricocheted off a wall and struck N.G. in the face, causing swelling in the child's face and leaving the child with a black eye. In November 2013, the Agency recommended that J.S. live elsewhere, but C.S. rejected the idea because if J.S. left and took his social security income with him, the family would not be able to maintain their current residence.

{¶ 27}    On January 2, 2014, one of C.S.'s nieces who was staying at C.S.'s home, overdosed on drugs. When the family's caseworker heard about this, she came to C.S.'s home to investigate. C.S. told her that the children had not witnessed the overdose. However, the caseworker later learned that in the summer of 2013, another one of C.S.'s nieces had become drunk and passed out at C.S.'s house, and that the children had witnessed that incident. No one had ever told the caseworker about this incident prior to the overdose incident.

{¶ 28}    On January 6, 2014, one of C.S.'s nephews, who was also living at C.S.'s home at the time, and four of his friends, one of whom was his girlfriend, attacked C.S. with a knife in the driveway of her house. C.S. was slashed on her head and hand. J.S. came to C.S.'s

defense and attacked the nephew with a knife, cutting the nephew's face. J.S. was arrested and jailed. C.S.'s injuries required 12 staples to her head and stitches to her fingers. A drug screen was performed on C.S., and she tested positive for benzodiazepine and oxycodone. The children were removed immediately after this incident.

{¶ 29} The Agency was concerned that C.S. was abusing her prescription medications. When the caseworker asked C.S. for permission to do a pill count of C.S.'s medications, C.S. refused, telling the caseworker that she had flushed all of her medications down the toilet three days earlier. During the permanent and legal custody hearing, C.S. testified that she is prescribed Xanax and Percocet and that she drank alcohol over New Year's Weekend. When C.S. was asked by her attorney if her positive drug test was the result of her prescription medication or alcohol, C.S. answered that she did not know.

{¶ 30} After the children were removed from C.S.'s residence, Father and Mother visited the children at the Agency's visitation facility, where they also received family counseling. The visits and counseling took place under the supervision of the Children's Diagnostic Center ("CDC"). During the visits, the children were happy to see Father and Father demonstrated he was bonded to the children. Father visited the children regularly and was focused on the children during the visits. Additionally, the parenting skills of both Mother and Father reportedly improved after they engaged in parenting education.

{¶ 31} However, the CDC supervisor noted that Father had difficulty in handling both children at the same time and that when Father and Mother were visiting the children together, they did not work well as co-parents as Mother tended to control the visit and Father acquiesced. The CDC supervisor also noted that Father had difficulty implementing appropriate consequences for bad behavior. For example, Father did not understand the inappropriateness of putting hot sauce or soap in the children's mouths as a punishment when the children misbehaved, and the supervisor believed that Father would continue to

need help in properly parenting the children.

**{¶ 32}** Lastly, the record shows that N.G. and L.T. are bonded to each other, and all parties agree that it is in the children's best interests that they remain together.

**{¶ 33}** As to the best-interest factor in R.C. 2151.414(D)(1)(b), the magistrate noted that the juvenile court did not interview the children, but that the children's guardian ad litem recommended that the Agency be granted permanent custody of the children. In his report, the guardian ad litem stated he did not interview L.T., who was five years old at the time of the permanent custody proceedings, due to her age. However, the guardian ad litem did interview N.G. and reported that N.G. did not want to return to C.S.'s home. The magistrate noted in his decision that all parties waived their right to cross-examine the guardian ad litem.

**{¶ 34}** As to the factor in R.C. 2151.414(D)(1)(c), the magistrate determined that for purposes of R.C. 2151.414(D)(1), the children have been in the temporary custody of the Agency since November 1, 2012, which date was 60 days after their removal from Mother's home on September 1, 2012. Therefore, the magistrate determined the children had been out of their parents' custody for almost two and one-half years at the time of the commencement of the permanent custody hearing, and thus, the children had been in the temporary custody of the agency for 12 months of a consecutive 22-month period immediately prior to the Agency filing its motion for permanent custody.

**{¶ 35}** As to the factor in R.C. 2151.414(D)(1)(d), there is clear and convincing evidence to support the juvenile court's determination that the children are in need of a legally secure placement and that such a placement cannot be achieved without granting the Agency permanent custody. The record shows that the children had been out of their Mother's home for approximately two and one-half years on the date the permanent custody hearing commenced. N.G.'s therapist testified that N.G. is experiencing a lot of anxiety as a result of being in foster care. The therapist explained that N.G.'s problem with foster care is

"[n]ot that she doesn't like it, but she's not real sure what's going to happen next."

{¶ 36} There is also clear and convincing evidence to support the juvenile court's determinations that neither C.S. nor Father are appropriate placements for the children. The incidents at C.S.'s home which led to the children's removal from that home show that C.S. is unable to protect the children, because she has a history of allowing several relatives into her home who have caused problems, including her nephew and her two nieces as detailed above. There are also troubling indications that C.S. may have a substance abuse problem with alcohol or prescription drugs. These same problems show that Father is also not an appropriate placement for the children as Father resides with C.S.

{¶ 37} Father argues that in considering the "legally secure permanent placement" factor in R.C. 2151.414(D)(1)(d), a juvenile court is not permitted to choose "the best option" for the child, but instead, "must specifically determine that granting permanent custody is the *only* way the child's need for such [legally secure] placement can be achieved." In support of his argument, Father cites this court's decision in *In re G.N.*, 170 Ohio App.3d 76, 2007-Ohio-126 (12th Dist.), where we stated that a "juvenile court must specifically determine that granting permanent custody is the *only* way the child's need for such [a legally secure] placement can be achieved." (Emphasis added.) *Id.* at ¶ 19. However, this court has overruled the language in *In re G.N.* on which Father relies, based on authority from the Ohio Supreme Court. *See In re J.L.M.*, 12th Dist. Butler Nos. CA2015-11-206, CA2015-12-209 through -211, 2016-Ohio-2773, ¶ 37, citing *In re M.M.*, 122 Ohio St.3d 541, 2009-Ohio-4048; and *In re H.P.*, 12th Dist. Preble No. CA2010-07-010, 2011-Ohio-1148.

{¶ 38} Father contends that he completed all of the requirements of his case plan, and points out that a DLS therapist testified she believes Father has the ability to parent the children independently provided he has the financial resources to do so. However, a case plan is a means to an end, and not an end itself. *In re A.R.*, 12th Dist. Butler No. CA2015-08-

143, 2016-Ohio-4919, ¶ 18. Additionally, Father refused to follow the caseworker's advice to engage in independent counseling because he believed he did not need such counseling. Moreover, the evidence as to Father's ability and commitment to parent the children and provide for them is somewhat contradictory.

{¶ 39} Father began engaging in case plan services in earnest only when the children's temporary custody placement with C.S. was terminated in January 2014. Prior to that time, Father appeared content to forfeit any right he had to the children's custody and allow C.S. to have custody of the children. After the children were placed in the temporary custody of the Agency, Father certainly has demonstrated some competence in his ability to parent L.T, but problems remain, such as his over-dependence on others for help and his failure to grasp appropriate disciplinary strategies.

{¶ 40} Furthermore, the evidence as to Father's financial stability is equivocal. For instance, while the evidence shows that Father is currently employed on a nearly full-time basis earning $8.85 per hour as a forklift operator at Menard's, Father did not obtain this job until April 17, 2015, which was shortly after the permanent custody hearing commenced. Historically, Father has not maintained a stable and independent income, but rather has depended upon others. Although Father's recent employment is a positive development, it must be weighed with some caution based upon Father's historical record of lacking financial stability and independence.

{¶ 41} However, Father's parenting ability is not the only concern. A paramount concern is that Father resides with C.S. and has expressed his intention to continue to reside with her despite abundant evidence that her home is not appropriate for children. This caused the juvenile court to conclude, correctly, that Father lacked independent, stable housing.

{¶ 42} There was never a home study approving C.S.'s and Father's current home. Of

great significance to this case is the fact that C.S. and Father restricted the Agency's access to their new home in the months immediately prior to the commencement of the permanent custody hearing. By the time the permanent custody hearing commenced on March 30, 2015, the caseworker had not been permitted to visit C.S.'s and Father's current residence since January 2015. C.S.'s previous home was identified in January 2014 as one that was not a safe environment for the children due to the drug use and violence present in the home. C.S. had been advised to move J.S. elsewhere in November 2013, but C.S. refused to do so because she was concerned about losing access to J.S.'s social security income. After the events in January 2014 that led to the termination of C.S.'s temporary custody of the children, C.S. was again advised by the Agency to make arrangements for J.S. to live elsewhere and to not permit J.S. to have any contact with the children. As indicated earlier, the Agency refused to do a new home study on C.S.'s home in August 2014 because J.S. was still living there. C.S. moved J.S. to a house across the street. However, after Father and Mother moved into that house to attempt a reconciliation, J.S. went back to C.S.'s house in December 2014 and lived there until March 10, 2015, less than three weeks before the first day of the permanent custody hearing.

{¶ 43} During the hearing, Father acknowledged that it was very important for the Agency to examine his and C.S.'s home where he intended to live with the children if he were to be granted custody. Father was then questioned as to why he continually refused to meet with workers from the Agency at this residence. Father essentially said that his work schedule would not allow it. When Father was asked if the Agency could inspect his current residence that day, Father again said his work schedule would not allow it. When Father was asked if C.S. could be at their current residence for an inspection, Father said that C.S. would not be able to meet with them either because of her work schedule. Father was unable to explain how he was able to find the time to meet with these same workers at places

like the public library but not find the time to meet with them at his current residence. Given that J.S. has historically resided with C.S. and that C.S. has expressed a financial incentive to permit J.S. to reside with her, in conjunction with Father's knowledge that J.S. and certain other persons were not permitted in his residence if he wanted to obtain custody of N.G. and L.T., and Father's repeated and consistent refusal to allow the Agency to inspect his current residence, there is a strong inference that Father is hiding something.

{¶ 44}    Because Father was insistent on remaining in C.S.'s home, he failed to provide a stable home for L.T. and therefore it was not appropriate to place L.T. with Father. Since the children have been in custodial limbo since September 2012, it was necessary to resolve any issue as to their ultimate placement expeditiously. Therefore, consideration of the best interest factor in R.C. 2151.414(D)(1)(d) that requires a court to consider "[t]he child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency" weighs heavily in favor of granting the Agency permanent custody, because the evidence clearly and convincingly shows that L.T. is in great need of a legally secure placement and that placement cannot be achieved without granting the Agency permanent custody.

{¶ 45}    Finally, as to the best-interest factor in R.C. 2151.414(D)(1)(e) that requires a court to consider whether any of the factors in R.C. 2151.414(E)(7) to (11) apply in relation to the parents and child, the magistrate found there was no evidence that any of these factor apply in this case.

{¶ 46}    A review of all the evidence in the record shows there was clear and convincing evidence presented to support the juvenile court's determination that granting the Agency permanent custody was in the children's best interest. Therefore, Father's first assignment of error is overruled.

{¶ 47}    In his second assignment of error, Father contends the juvenile court erred by

finding that the children had been in the Agency's temporary custody for more than 12 months of a consecutive 22-month period by the date the Agency filed its motion for permanent custody, and therefore the juvenile court lacked jurisdiction to award the Agency permanent custody pursuant to R.C. 2151.414(B)(1)(d).

{¶ 48}    As we indicated earlier, R.C. 2151.414(B)(1) allows a juvenile court to award a public children services agency permanent custody if the court finds that granting the agency permanent custody is in the child's best interest and that at least one of the five factors or conditions in R.C. 2151.414(B)(1)(a)-(e) applies, including the so-called "12 of 22" rule set forth in R.C. 2151.414(B)(1)(d), i.e., the child has been in the agency's temporary custody for at least 12 months of a consecutive 22-month period.  "A juvenile court lacks authority to grant an agency's motion on R.C. 2151.414(B)(1)(d) grounds if those grounds were not satisfied when the motion was filed." *In re C.W.*, 104 Ohio St.3d 163, 2004-Ohio-6411, ¶ 24.

{¶ 49}    Here, Father acknowledges that, at first glance, the facts of this case seemingly show that the Agency complied with the 12 of 22 rule, as N.G. and L.T. were removed from C.S.'s temporary custody on January 7, 2014, and placed in the Agency's temporary custody at that time, and the Agency waited to file its motion for permanent custody more than 12 months later on February 9, 2015.  Father contends, however, that a "plain reading" of R.C. 2151.414(B)(1) requires that the children not be considered to have entered the Agency's temporary custody until March 8, 2014, that is, 60 days after they were removed from C.S.'s home on January 7, 2014.  Consequently, Father argues that by moving for permanent custody on February 9, 2015, the Agency filed its motion too soon to permit the Agency to claim that the children had been in the Agency's custody for at least 12 months of a consecutive 22-month period.  We find Father's argument unpersuasive.

{¶ 50}    Initially, Father did not raise a *specific* objection to the magistrate's decision on this ground, as required by Juv.R. 40(D)(3)(b)(ii), and thus has procedurally defaulted on this

claim except for a claim of plain error. Juv.R. 40(D)(3)(b)(iv). However, the juvenile court did not commit any error, plain or otherwise, in determining that the children had been in the Agency's temporary custody for more than 12 months of a consecutive 22-month period, for purposes of R.C. 2151.414(B)(1)(d), by the time the Agency moved for permanent custody.

{¶ 51} The last sentence of R.C. 2151.414(B)(1) states that "[f]or purposes of division (B)(1) of this section, a child shall be considered to have entered the temporary custody of an agency on the earlier of the date the child is adjudicated pursuant to [R.C.] 2151.28 or the date that is sixty days after the removal of the child from home."

{¶ 52} Father contends the children were removed "from home" for purposes of R.C. 2151.414(B)(1), when they were removed from C.S.'s home on January 7, 2014. However, this is incorrect. The termination of the order placing the children in the temporary custody of C.S. is not a "removal from home." This is apparent from the definition of "temporary custody" under R.C. 2151.011(B)(56), which provides

> "Temporary custody" means legal custody of a child *who is removed from the child's home*, which custody may be terminated at any time at the discretion of the court or, if the legal custody is granted in an agreement for temporary custody, by the person who executed the agreement.

(Emphasis added.)

{¶ 53} By definition, temporary custody includes the concept that a child has already been removed from the "child's home." Termination of a relative's temporary custody of a child is not a removal of the child from the "child's home."

{¶ 54} R.C. 2151.414(B)(1) explicitly states that "*a child shall be considered to have entered the temporary custody of an agency* on the earlier of the date the child is adjudicated pursuant to [R.C] 2151.28 or the date that is sixty days after the removal of the child from home." (Emphasis added.) The statute does not require that a child be in the temporary custody of an agency as a matter of fact, but rather provides for when a child shall "be

considered to have entered the temporary custody of an agency" for purposes of applying the 12 of 22 rule. In other words, pursuant to the last sentence of R.C. R.C. 2151.414(B)(1), it makes no difference whether a child is placed in the temporary custody of an agency, a relative, or a third-party for purposes of applying the 12 of 22 rule.

{¶ 55} The children were actually removed "from home" on September 1, 2012, when they were removed from Mother's home and placed in the temporary custody of C.S. The children were adjudicated dependent, pursuant to R.C. 2151.28, on February 19, 2013. Therefore, under R.C. 2151.414(B)(1), the children must "be considered to have entered" the Agency's temporary custody on November 1, 2012, which was 60 days after their September 1, 2012 removal from Mother's home, and is earlier than the date they were adjudicated dependent (February 19, 2013).

{¶ 56} Furthermore, even if we assume, for the sake of argument, that the children were removed "from home" on January 7, 2014, Father's argument still cannot prevail. For purposes of R.C. 2151.414(B)(1), the children were adjudicated dependent on February 19, 2013, which is earlier than March 8, 2014, the date 60 days after the children were removed from C.S.'s home on January 7, 2014. The children were in the temporary custody of the Agency, as a matter of fact, for 12 or more months of a consecutive 22-month period after the date they were adjudicated dependent.

{¶ 57} Given the foregoing, the juvenile court did not err by finding that the children have been in the Agency's temporary custody for more than 12 months of a consecutive 22-month period, for purposes of R.C. 2151.414(B)(1)(d). Consequently, Father's second assignment of error is overruled.

{¶ 58} In her assignment of error, C.S. argues the juvenile court erred by awarding the Agency permanent custody and dismissing her motion for legal custody of the children. Specifically, she asserts the juvenile court erred by failing to properly apply the best-interest

factor in R.C. 2151.414(D)(1)(d) regarding a child's need for a "legally secure permanent placement" and whether such a placement can be achieved without granting the Agency permanent custody of the child. C.S. contends that granting her legal custody of the children was an acceptable alternative to awarding the Agency permanent custody of the children, and therefore the juvenile court's decision to award the Agency permanent custody was not supported by clear and convincing evidence and was contrary to the manifest weight of the evidence.

{¶ 59} "R.C. 2151.353(A)(3) provides that if a child is adjudicated a dependent child, the court may award legal custody of the child 'to either parent or to any other person who, prior to the dispositional hearing, files a motion requesting legal custody of the child[.]'" *In re A.R.*, 2016-Ohio-4919 at ¶ 13, quoting R.C. 2151.353(A)(3). "Legal custody vests in the custodian the physical care and control of the child while residual parental rights and responsibilities remain intact[,]" and "[u]nlike permanent custody, granting legal custody does not terminate the parent-child relationship." *In re M.M.*, 12th Dist. Fayette No. CA2010-12-034, 2011-Ohio-3913, ¶ 7; R.C. 2151.011(B)(19). A juvenile court "may award legal custody to a nonparent upon a demonstration by a preponderance of the evidence that granting legal custody to the nonparent is in the child's best interest." *In re C.A.*, 12th Dist. Butler No. CA2014-07-165, 2015-Ohio-1410, ¶ 13.

{¶ 60} A juvenile court must base its custody determination under R.C. 2151.353 on the best interest of the child. *Id.* at ¶ 14. In determining the best interest of the child, R.C. 3109.04(F)(1) requires the juvenile court to consider all relevant factors, including, but not limited to, any applicable factors in R.C. 3109.04(F). *Id.*

{¶ 61} An appellate court reviews a juvenile court's custody determination under an abuse-of-discretion standard. *In re C.A.*, 2015-Ohio-1410 at ¶ 15. A juvenile court abuses its discretion when it acts unreasonably, arbitrarily, or unconscionably. *Blakemore v.*

- 18 -

*Blakemore*, 5 Ohio St.3d 217, 219 (1983). The juvenile court's exercise of its discretion in custody matters is entitled to the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned. *In re C.A.* at ¶ 15. Thus, an appellate court will afford deference to the juvenile court's findings regarding the credibility of the witnesses. *Id.*

**{¶ 62}** In considering a claim that the juvenile court's decision is contrary to the manifest weight of the evidence, "a reviewing court must determine whether the finder of fact, in resolving conflicts in the evidence, clearly lost his way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered." *In re X.B.*, 12th Dist. Butler No. CA2014-07-168, 2015-Ohio-1174, ¶ 21. The reviewing court is guided by the presumption that the juvenile court's findings are correct. *Id.* Thus, where an award of custody is supported by a substantial amount of credible and competent evidence, the reviewing court will not reverse the juvenile court's custody determination on the grounds that it is contrary to the manifest weight of the evidence. *Id.*

**{¶ 63}** As indicated above, C.S.'s home was not an appropriate placement for the children and C.S. was not an appropriate custodian of the children, since there was clear and convincing evidence she was unable to protect them. C.S.'s home was identified in January 2014 as one that was not a safe environment due to the drug use and violence that occurred at the home, and as a result, the children were removed from C.S.'s home at that time. There is no evidence that the conditions that led to the children's removal from C.S.'s home in January 2014 have changed. There was never a home study performed approving C.S.'s current residence, and C.S. and Father restricted the Agency access to the home in the months immediately prior to the commencement of the permanent custody hearing.

**{¶ 64}** Further, C.S. and Father were both unable to provide a plausible explanation as to why they refused to allow the Agency to inspect their current residence. While C.S asserts

that she will not allow J.S. to return to her new residence, it is clear that the juvenile court simply did not believe her, and there is clear and convincing evidence to support the juvenile court's refusal to believe her on this matter. C.S. has a strong, emotional connection to J.S. as well as significant financial reasons for not wanting to bar J.S. from her home, namely, to maintain access to J.S.'s social security income.

{¶ 65} In light of the foregoing, C.S.'s assignment of error is overruled.

{¶ 66} Judgment affirmed.

S. POWELL and PIPER, JJ., concur.