[Cite as *In re D.E.*, 2018-Ohio-3341.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

WARREN COUNTY


IN THE MATTER OF:  D.E.                         :

                                                :         CASE NOS. CA2018-03-035
                                                                   CA2018-04-038
                                                :
                                                          O P I N I O N
                                                :            8/20/2018

                                                :


APPEAL FROM WARREN COUNTY COURT OF COMMON PLEAS
JUVENILE DIVISION
Case No. 16-D000042


Caparella-Kraemer & Associates, LLC, Tyler W. Nagel, 4841-A Rialto Road, West Chester, OH 45069, for appellant, father

Mark W. Raines, 246 High Street, Hamilton, OH 45011, for appellant, maternal grandmother

David P. Fornshell, Warren County Prosecuting Attorney, Kirsten A. Brandt,  520 Justice Drive, Lebanon, OH 45036, for appellee, Warren County Children Services


**S. POWELL, P.J.**

{¶ 1} Appellants, the biological father ("Father") and maternal grandmother ("Grandmother") of D.E., appeal the decision from the Warren County Court of Common Pleas, Juvenile Division, granting permanent custody of D.E. to appellee, Warren County Children Services ("WCCS").  For the reasons outlined below, we affirm.

**Facts and Procedural History**

{¶ 2}  On January 7, 2016, D.E. was born weighing 6.03 pounds.  At the time of his birth, the identity of D.E.'s biological father was unknown.  Following a paternity test, D.E.'s biological father was proven to be Father, who, as noted above, is a party to this appeal.  At Grandmother's request, the juvenile court permitted Grandmother, who is also a party to this appeal, to intervene and participate in the juvenile court proceedings.  D.E.'s biological mother ("Mother") is not a party to his appeal and her whereabouts are generally unknown.

{¶ 3}  On March 9, 2016, WCCS filed a complaint alleging D.E. was a neglected and dependent child.  In support of its complaint, WCCS alleged D.E. had lost weight since his birth, then weighing just 5.62 pounds.  Due to D.E.'s weight loss in the weeks following his birth, Mother was instructed to immediately take D.E. to the hospital.  Mother agreed.  Mother, however, did not take D.E. to the hospital until the following day.

{¶ 4}  Once at the hospital, D.E. was observed to be "very hungry," but that he nevertheless took his bottle "appropriately."  D.E. was also observed to have "skin hanging off of his legs and his ribs and backbone were visible," which resulted in D.E. being diagnosed as failure to thrive.  When confronted about D.E.'s condition, although having more than enough food for D.E.'s four older siblings, Mother claimed she had just recently run out of formula for D.E.  It is undisputed that D.E. gained one pound during his five-day stay in the hospital.  There is also no dispute that D.E. did not gain any additional weight once he was returned to Mother following his release from the hospital.

{¶ 5}  Several days after D.E. was released from the hospital, the record indicates Mother failed to take D.E. to several "weight-check" appointments.  Due to Mother's failure to attend these appointments, a nurse was dispatched to Mother's home.  Once there, the nurse observed D.E. struggling with labored breathing.  According to WCCS' complaint, when asked about D.E.'s breathing, "Mother told the nurse that she noticed the labored

breathing, but she did not have a ride to the hospital." D.E. was then taken to the hospital via ambulance. D.E., however, was not admitted to the hospital. D.E. was instead returned to Mother with instructions to return to the hospital for a follow-up appointment. Due to Mother's apparent inability to properly care for D.E., WCCS concluded its complaint by noting its concern that "Mother is unable to follow through with the necessary medical care for [D.E.]."

{¶ 6} Shortly after WCCS filed its complaint, the juvenile court held an emergency shelter care hearing and placed D.E. in the emergency shelter care of WCCS. The juvenile court also appointed D.E. with a court appointed special advocate ("CASA"). After being placed in the temporary custody of WCCS, on March 10, 2016, D.E. was moved to a nearby foster-to-adopt foster home. It is undisputed that D.E. has resided in the same foster-to-adopt home with the same foster parents after he was placed in the temporary custody of WCCS. D.E.'s foster mother is a stay-at-home mother to her other children, whereas foster Father is a member of the Air Force stationed at Wright Patterson Air Force Base.

{¶ 7} On May 13, 2016, the juvenile court issued a decision adjudicating D.E. a dependent child. Approximately three weeks later, the juvenile court issued a dispositional decision ordering D.E. remain in the temporary custody of WCCS. A case plan was then established for Mother that required Mother to take parenting classes, learn how to parent a child that has been diagnosed with failure to thrive, and comply with all recommendations made by medical professionals regarding D.E.'s care. Mother was also required to submit to random drug screens and to maintain stable housing, employment, and income.

{¶ 8} On September 2, 2016, the juvenile court held a 90-day review hearing after which the juvenile court found it was in D.E.'s best interest to remain in the temporary custody of WCCS. The juvenile court also found Mother had been slow to engage in the required case plan services in that Mother had yet to complete the necessary parenting

classes. Several weeks later, a conflict was discovered that required the CASA be removed from the case, thus resulting in the juvenile court appointing D.E. with a guardian ad litem.

{¶ 9} On December 2, 2016, the juvenile court held a 180-day review hearing and the juvenile court again determined it was in D.E.'s best interest to remain in the temporary custody of WCCS. The juvenile court also found Mother had still not engaged in case plan services as she had still not completed the necessary parenting classes. The juvenile court further found Mother had neither visited with D.E. nor provided WCCS with a negative drug screen. The record indicates Mother thereafter submitted to a random drug screen and tested positive for marijuana. Mother also acknowledged that she had consumed alcohol.

{¶ 10} On March 3, 2017, the juvenile court held a 270-day review hearing and once again determined it was in D.E.'s best interest to remain in the temporary custody of WCCS. The juvenile court also found Mother had limited contact with D.E. and WCCS and that Mother now disputed the need for the required case plan services, including the need to complete the necessary parenting classes. The juvenile court further found Father had not had any contact with D.E. or WCCS since D.E. was placed in its temporary custody.

{¶ 11} After holding the 270-day review hearing, the juvenile court granted WCCS' motion for a six-month extension of the juvenile court's temporary custody order. Shortly thereafter, once Father's paternity was established, an amended case plan was approved by the juvenile court noting Father now wanted to be involved in the case and work to obtain custody of D.E. To that end, the amended case plan required Father to submit to random drug screens, take parenting classes, and obtain stable housing and employment.

{¶ 12} Following a June 2, 2017 360-day review hearing, the juvenile court again determined it was in D.E.'s best interest to remain in the temporary custody of WCCS. The juvenile court also found Father had since engaged in some of the required case plan services, but that Father still needed to obtain stable housing and employment. As for

Mother, the juvenile court found Mother had not had any contact with WCCS for approximately three months. The juvenile court also found Mother seldom if ever visited D.E. Finally, as it relates to Grandmother, the juvenile court granted Grandmother visitation with D.E., which included a plan to gradually increase Grandmother's visitation time in hopes that she would ultimately be granted legal custody of D.E. and D.E.'s four older siblings, all of whom were under the age of ten.

{¶ 13} On June 15, 2017, Grandmother filed a pro se motion for legal custody of D.E. arguing it was in D.E.'s best interest to reside with her instead of with his foster parents. At the time Grandmother filed her motion, it is undisputed that Grandmother was taking care of D.E.'s four older siblings who had since been placed in her care. It is also undisputed that Grandmother was later granted legal custody of D.E.'s four older siblings then in her care on September 1, 2017.

{¶ 14} On August 21, 2017, WCCS filed another motion requesting an additional six-month extension of the juvenile court's temporary custody order. Ten days later, on August 31, 2017, the guardian ad litem filed a motion for permanent custody of D.E. to WCCS. As part of this motion, the guardian ad litem noted that Father, who lived in a one-bedroom apartment, had not verified his employment or income, "although he reports working as a 'promoter' and is paid in cash." The guardian ad litem also noted that Father had been inconsistent in visiting with D.E. after his paternity was established. The guardian ad litem further noted that Grandmother had not visited D.E. in the weeks since the juvenile court had granted her visitation. The guardian ad litem additionally noted that D.E. had now bonded with his foster parents, the same foster parents D.E. had resided with since being placed in the temporary custody of WCCS on March 10, 2016. WCCS later filed a notice withdrawing its motion for an additional six-month extension of the juvenile court's temporary custody order, as well as a memorandum in support of the guardian ad litem's

motion for permanent custody.

{¶ 15} On September 1, 2017, the juvenile court held a 450-day review hearing after which it once again determined it was in D.E.'s best interest to remain in the temporary custody of WCCS. The juvenile court also found Mother had not visited D.E. in several months and that Father had only visited D.E. sporadically. The following month, on October 16, 2017, Father also filed a motion for legal custody of D.E.

{¶ 16} Beginning on December 8, 2017, the juvenile court held a three-day hearing on all motions then pending, including both Father and Grandmother's motions for legal custody and the guardian ad litem's motion for permanent custody. This hearing ultimately concluded on March 5, 2018. As part of this three-day hearing, the juvenile court heard testimony from both Father and Grandmother, the guardian ad litem, as well as D.E.'s foster parents, among others. As part of this testimony, D.E.'s foster mother specifically testified that she and her husband were "100 percent" interested in adopting D.E. should WCCS be granted permanent custody.

{¶ 17} On March 13, 2018, the juvenile court issued a detailed 17-page decision granting the guardian ad litem's motion for permanent custody to WCCS. In so holding, the juvenile court found that having D.E. be adopted by his foster parents was "the best chance for [D.E.] to achieve the stable family home he needs. His adoption is not possible without a grant of permanent custody to WCCS."

## Appeal

{¶ 18} Father and Grandmother now appeal from the juvenile court's decision, collectively raising the following three assignments of error for review.

{¶ 19} Father's Assignment of Error No. 1:

{¶ 20} THE TRIAL COURT ERRED IN GRANTING THE GUARDIAN AD LITEM'S MOTION FOR PERMANENT CUSTODY.

{¶ 21} Grandmother's Assignment of Error No. 1:

{¶ 22} THE TRIAL COURT ERRED WHEN IT DENIED [GRANDMOTHER'S] MOTION FOR LEGAL CUSTODY.

{¶ 23} Grandmother's Assignment of Error No. 2:

{¶ 24} THE TRIAL COURT'S DECISION TO GRANT WARREN COUNTY CHILDREN'S SERVICES PERMANENT CUSTODY IS NOT SUPPORTED BY SUFFICIENT CLEAR AND CONVINCING EVIDENCE AND IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 25} For ease of discussion, the arguments raised by Father and Grandmother within their three assignments of error will be addressed together.

### Standard of Review

{¶ 26} In each of their three assignments of error, Father and Grandmother argue the juvenile court's decision to grant the guardian ad litem's motion for permanent custody was not supported by sufficient evidence and was otherwise against the manifest weight of the evidence. Under these circumstances, this court applies the following standard of review.

{¶ 27} Before a natural parent's constitutionally protected liberty interest in the care and custody of his child may be terminated, the state is required to prove by clear and convincing evidence that the statutory standards for permanent custody have been met. *In re K.W.*, 12th Dist. Butler No. CA2015-06-124, 2015-Ohio-4315, ¶ 11, citing *Santosky v. Kramer*, 455 U.S. 745, 759, 102 S.Ct. 1388 (1982). An appellate court's review of a juvenile court's decision granting permanent custody is generally limited to considering whether sufficient credible evidence exists to support the juvenile court's determination. *In re M.B.*, 12th Dist. Butler Nos. CA2014-06-130 and CA2014-06-131, 2014-Ohio-5009, ¶ 6. In turn, this court will reverse a juvenile court's decision only if there is a sufficient conflict in the

evidence presented. *In re K.A.*, 12th Dist. Butler No. CA2016-07-140, 2016-Ohio-7911, ¶ 10. However, even if the juvenile court's decision is supported by sufficient evidence, "an appellate court may nevertheless conclude that the judgment is against the manifest weight of the evidence." *In re T.P.*, 12th Dist. Butler No. CA2015-08-164, 2016-Ohio-72, ¶ 19.

{¶ 28} As with all challenges to the manifest weight of the evidence, in determining whether a juvenile court's decision is against the manifest weight of the evidence in a permanent custody case, an appellate court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered." *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 20. The presumption in weighing the evidence is in favor of the finder of fact, which we are especially mindful of in custody cases. *In re C.Y.*, 12th Dist. Butler Nos. CA2014-11-231 and CA2014-11-236 thru CA2014-11-238, 2015-Ohio-1343, ¶ 25. Therefore, "[i]f the evidence is susceptible to more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment." *Eastley* at ¶ 21.

**Analysis**

{¶ 29} As noted above, in each of their three assignments of error, Father and Grandmother argue the juvenile court's decision to grant the guardian ad litem's motion for permanent custody was not supported by sufficient evidence and was otherwise against the manifest weight of the evidence. Father and Grandmother instead argue that it was in D.E.'s best interest to grant legal custody of D.E. to either Father or Grandmother, generally noting their strong bond to D.E. and their collective desire to include D.E. as part of their family unit.

{¶ 30} Pursuant to R.C. 2151.414(B)(1), the juvenile court may terminate parental rights and award permanent custody of a child to a children services agency if the court makes findings pursuant to a two-part test. *In re G.F.*, 12th Dist. Butler No. CA2013-12-248, 2014-Ohio-2580, ¶ 9. First, the juvenile court must find that the grant of permanent custody to the agency is in the best interest of the child, utilizing, in part, the factors of R.C. 2151.414(D). *In re D.K.W.*, 12th Dist. Clinton No. CA2014-02-001, 2014-Ohio-2896, ¶ 21. Second, the juvenile court must find that any of the following apply: (1) the child is abandoned; (2) the child is orphaned; (3) the child has been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period; (4) where the preceding three factors do not apply, the child cannot be placed with either parent within a reasonable time or should not be placed with either parent; or (5) the child or another child in the custody of the parent from whose custody the child has been removed, has been adjudicated an abused, neglected, or dependent child on three separate occasions. *In re C.B.*, 12th Dist. Clermont No. CA2015-04-033, 2015-Ohio-3709, ¶ 10. Only one of these findings must be met in order to satisfy the second prong of the permanent custody test. *In re A.W.*, 12th Dist. Fayette No. CA2014-03-005, 2014-Ohio-3188, ¶ 12.

{¶ 31} The juvenile court found D.E. had been in the temporary custody of WCCS for more than 12 months of a consecutive 22-month period as of the date the guardian ad litem filed his motion for permanent custody. Father and Grandmother do not dispute this finding. Rather, as noted above, Father and Grandmother argue the juvenile court's decision finding it was in D.E.'s best interest to grant the guardian ad litem's motion was not supported by sufficient evidence and was otherwise against the manifest weight of the evidence. After a thorough review of the record, because the record fully supports the juvenile court's decision, we find Father and Grandmother's claims lack merit.

{¶ 32} When considering the best interest of a child in a permanent custody case,

the juvenile court is required under R.C. 2151.414(D)(1) to consider certain enumerated factors, which include, but are not limited to (1) the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child; (2) the wishes of the child, as expressed directly by the child or through the child's guardian ad litem; (3) the custodial history of the child; (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (5) whether any of the factors listed in R.C. 2151.414(E)(7) to (11) apply in relation to the parents and child. *In re J.C.*, 12th Dist. Brown No. CA2017-11-015, 2018-Ohio-1687, ¶ 22. The juvenile court may also consider any other factor(s) it deems relevant to the child's best interest. *In re N.R.S.*, 3d Dist. Crawford Nos. 3-17-07 thru 3-17-09, 2018-Ohio-125, ¶ 15 ("[t]o make a best interest determination, the trial court is required to consider all relevant factors listed in R.C. 2151.414[D], as well as any other relevant factors").

{¶ 33} With respect to D.E.'s relevant interactions and relationships with those who may significantly affect his young life, the record indicates D.E. is bonded to both Father and Grandmother, as well as his four older siblings for whom Grandmother has legal custody. However, the record indicates D.E. is also bonded to his foster parents and foster siblings, having resided in the same foster home with the same foster parents since he was just two months old. Specifically, as D.E.'s foster mother testified, D.E.'s foster siblings "love him" and are "very bonded to him," just as D.E. is "very bonded to them."

{¶ 34} We agree with the juvenile court's finding that the record indicates D.E.'s foster parents are good, hardworking individuals who agreed to undertake the daunting task of providing D.E. with the stable home after being diagnosed as failure to thrive. The record also indicates D.E.'s foster parents have expressed their willingness to adopt D.E. should

permanent custody be granted to WCCS. The record further indicates D.E. is now thriving in his foster parents' home, a finding that can generally be attributed to D.E.'s foster mother's status as a stay-at-home mother who focuses her attention exclusively on D.E. throughout the day.

{¶ 35} Next, in regards to D.E.'s wishes, the juvenile court did not state D.E.'s wishes, likely due to his young age having just turned two years old. The guardian ad litem, however, noted as part of his report and recommendation that he believed it was in D.E.'s best interest to grant permanent custody to WCCS. This is made clear by the fact that it was the guardian ad litem, not WCCS, who moved the juvenile court to grant permanent custody. The guardian ad litem further noted in his report and recommendation that D.E. appeared "very bonded" with his foster parents.

{¶ 36} Regarding D.E.'s custodial history, as noted above, the juvenile court found D.E. had been in the temporary custody of WCCS for over 12 of a consecutive 22-month period as of the date the guardian ad litem filed his motion for permanent custody. Neither Father or Grandmother dispute this finding.

{¶ 37} With respect to D.E.'s need for a legally secure permanent placement, the record indicates D.E. was in need of permanency after having been in the temporary custody of WCCS well over 12 months of a consecutive 22-month period. D.E. has now achieved this legally secure permanent placement with his foster parents. As noted above, D.E.'s foster parents have expressed their willingness to adopt D.E. Specifically, as D.E.'s foster mother testified, she and her husband were "100 percent" interested in adopting D.E. should WCCS be granted permanent custody. D.E.'s foster home is the same home he was placed in after WCCS obtained temporary custody, thereby fully establishing the juvenile court's finding D.E.'s foster home was "the only home that [D.E.] has ever known."

{¶ 38} On the other hand, as it relates to Father, the record indicates Father, who

lives in a one-bedroom apartment, did not have any of the items necessary to raise a two-year-old child, let alone a child like D.E. who has extensive medical issues that require special attention. This includes a recent diagnosis that D.E. was suffering from cerebral palsy. For example, although claiming he had more than enough space to accommodate D.E. in his home, when asked if he had a bed for D.E., Father testified he had a "futon in my living room. Futon just lay it out." Although it should generally go without saying, this is an inappropriate sleeping arrangement for a two-year-old child.

{¶ 39} The record further indicates Father never attended any of D.E.'s medical appointments, although he testified that he could have, and was generally unaware of D.E.'s medical needs. This is of particular significance given the fact that Father only visited D.E. sporadically after he was granted visitation, never attending more than four consecutive visits, including one visit where Father fell asleep. Father, however, testified he merely "dozed for like a second right there." Regardless, even when Father would visit D.E., the record indicates D.E.'s behavior changed after he was returned to his foster parents in that D.E. would not listen or follow his foster parent's directions. Father testified he missed many of his visits with D.E. due to a lack of transportation, at one point claiming his key froze in the lock of his car, and "some due to the weather."

{¶ 40} Continuing, the juvenile court found "Father's attempts at case plan objectives can be characterized as 'too little, too late.'" This includes Father's last-minute attempt to complete his required mental health services for which he admittedly missed several appointments, as well as Father's refusal to submit to several drug screens. When asked why he refused to submit to several drug screens, Father testified he thought it was "inappropriate" and that he felt "disrespected for real." Father's refusal to submit to several drug screens is of particular concern given the fact that Father at one time admitted to WCCS to smoking marijuana, possibly even daily. Specifically, although Father later

claimed he was joking, the record indicates Father told a case worker during a home visit that he smoked marijuana "every day before he became involved with the agency, and, if [D.E] was back in his care he would be back to smoking pot every day." Father instead claimed he had been sober for over a year and that he "put all that down, and, try to focus, get my life together. I'm too old to be trying to kill myself[.]"

{¶ 41} The juvenile court also found that there was some question regarding Father's employment and income given Father's testimony that he had just recently been laid off from his part-time position at Kroger and that he now worked as a "promoter" in the music industry and was paid only in cash. Father, therefore, could not provide any proof of his employment or income as required by his case plan. Father also testified that he had worked for a "slaughterhouse" in Cincinnati, sometimes worked for a moving company, which could result in him working nearly 30 hours per week, and that he was receiving Social Security benefits. When asked why he was receiving Social Security, Father testified "I think I got hit upside the head with something, and then they said I had a brain leak."

{¶ 42} As it relates to Grandmother, the juvenile court found Grandmother, who lives in a two-bedroom townhouse, was already overly committed to taking care of D.E.'s four older siblings, all of whom were under the age of ten. This is hardly an ideal environment in which to raise five young children under any circumstances let alone in a situation where the youngest of those five children, D.E., has significant medical issues that require special attention. As noted above, this includes a recent diagnosis that D.E. was suffering from cerebral palsy. As one case worker testified, "there really isn't sufficient space to add [D.E.] to it given the arrangement of the home. * * * It was more of a space issue." We agree.

{¶ 43} The record also indicates Grandmother failed to follow the prescribed visitation schedule after she was granted visitation with D.E. As noted by the juvenile court, the visitation schedule put in place by WCCS gave Grandmother the "perfect opportunity to

exercise a graduated visitation schedule which most certainly would have resulted in her getting legal custody of [D.E.]" Grandmother, however, squandered this opportunity by either not responding or by making various excuses for her absence, such as alleged conflicts with her work schedule, troubles with her car, and predictions for inclement weather.[1]

{¶ 44} The record also indicates Grandmother was at one point denied her visitation time with D.E. after she refused to show D.E.'s foster parents the car seat she intended to use to transport D.E. This was a concern given the fact that Grandmother had previously only had a booster seat instead of the necessary five-point harness car seat. The record further indicates Grandmother also failed to attend any of D.E.'s medical appointments and was otherwise unnecessarily argumentative with WCCS regarding D.E.'s care and visitation schedule.

{¶ 45} Of additional concern to WCCS was the fact that Grandmother initially disputed WCCS' reasons for removing D.E. from Mother's care, an opinion Grandmother changed only after being shown several photographs of D.E.'s malnourished, frail body taken in the days immediately after D.E.'s removal. This court has reviewed the photographs submitted to the juvenile court. The photographs clearly depict D.E. in significant need of immediate medical attention, thereby calling into question the veracity of Grandmother's claim that she had spent several weeks helping Mother care for D.E. following his birth. Regardless, although Grandmother ultimately changed her opinion, and despite the fact that Grandmother denied seeing D.E. immediately prior to his removal, the

---

1. As noted by the juvenile court, Grandmother gave a convoluted explanation of her work schedule, some weeks claiming to have worked up to 50 hours a week, but more recently only working one day per month. Based on this court's review of the record, we find Grandmother's claim that her work schedule prevented her from visiting with D.E. to be disingenuous, particularly when considering Grandmother was given the opportunity to provide her own visitation schedule, to which Grandmother declined and instead became angry and irate with WCCS and claimed that she was being "policed" and treated like she was "crazy."

fact that Grandmother initially disputed WCCS' reasons for removing D.E. from Mother's care is troubling, particularly when considering Grandmother has since been granted legal custody of D.E.'s four older siblings, who, as noted above, are all under the age of ten.

{¶ 46} Finally, with respect to any of the factors contained in R.C. 2151.414(E)(7) thru (11), the juvenile court found Mother had abandoned D.E. in that she had failed to have any contact with D.E. for a period of at least 90 days prior to the filing of the guardian ad litem's motion for permanent custody. Yet, even when Mother did visit with D.E., the record indicates the visits were, at best, unproductive in that Mother wanted to leave mere minutes after she arrived and at one point arrived intoxicated. The factors contained in R.C. 2151.414(E)(7) thru (11) did not apply to either Father or Grandmother.

{¶ 47} Again, after a full and thorough review of the record, we find the record fully supports the juvenile court's decision to grant the guardian ad litem's motion for permanent custody. Father nevertheless argues the juvenile court erred by granting the guardian ad litem's motion since he was largely compliant with his case plan services. Similarly, Grandmother argues the juvenile court erred by granting the guardian ad litem's motion since Father had "complied with all his services, made significant progress towards resolving the issues of concern and maintained stable housing and income throughout the case." However, while we agree that these factors would be favorable to Father, the record does not support many of Father and Grandmother's claims.

{¶ 48} For instance, while Father claims he submitted to random drug screens, all of which were negative, the record indicates Father had refused to submit to several of these tests, thus raising a significant question regarding Father's claim that he had since stopped using illegal drugs, most notably his admitted potentially daily usage of marijuana. As noted by the juvenile court, "[t]hat fact, in and of itself, is incompatible with getting custody of [D.E.]" We agree. These concerns are only magnified considering Father at one point told

a case worker during a home visit that he smoked marijuana "every day before he became involved with the agency, and, if [D.E] was back in his care he would be back to smoking pot every day."

{¶ 49} Father also claims he had adequate housing to properly care for D.E. Yet, as the juvenile court found, Father, who lives in a one-bedroom apartment, "is not equipped to have [D.E.] in his current living arrangement and has none of the items necessary for a two year old toddler." This is particularly true here considering Father has since obtained legal custody of his and Mother's most recent child, a child who at that time was purportedly only a few months old.[2] As a case worker testified, "space wise would be a concern as if there would be enough space, um, and if he'd be able to accommodate the reported other child with [D.E.]" Again, when asked if he had a bed for D.E., Father testified he had a "futon in my living room. Futon just lay it out."

{¶ 50} There were also concerns raised by WCCS that Father was still involved with Mother given their tumultuous relationship, a relationship Father testified was now on-again-off-again. This includes numerous allegations of domestic violence. For instance, as one case worker testified, Father was alleged to have pushed Mother while she was holding one of D.E.'s older siblings. Although not clear, the record indicates this altercation resulted in Father being convicted of domestic violence and placed on probation. Father was also convicted of disorderly conduct after he was alleged to have removed D.E.'s four older siblings from the house and left them on the street. Father denied these allegations claiming

---

2. Although the record indicates Father had been granted legal custody of his and Mother's most recent child, a case worker testified that she found no signs of Father taking care of any children at his apartment. Instead, the record indicates the child had been placed with a third party, the child's uncle, who had previously been rejected as a suitable placement for D.E. due to his prior convictions for both robbery and abduction. When asked about this child, the child's uncle, Father, and Grandmother all provided elusive answers to the juvenile court's questions regarding the whereabouts of the child. This includes testimony from the child's uncle who testified "[w]e grabbed [the child] so they, she didn't have to grow up in this. * * * We help with [the child] so she would never have to go through this."

that any such claim was untrue. Father did admit, however, that he had never paid his child support obligations for D.E.'s four older siblings, thereby resulting in Father being approximately $14,000 in arrears.

{¶ 51} Regardless, even if we were to agree that the record did support Father and Grandmother's claims, which we do not, it is well-established that "the case plan is 'simply a means to a goal, but not the goal itself.'" *In re E.B.*, 12th Dist. Warren No. CA2009-10-139, 2010-Ohio-1122, ¶ 30, quoting *In re C.C.*, 187 Ohio App. 3d 365, 2010-Ohio-780, ¶ 25 (8th Dist.). "[T]he key concern is not whether the parent has successfully completed the case plan, but whether the parent has *substantially remedied* the concerns that caused the child's removal from the parent's custody." (Emphasis sic.) *In re S.M.*, 12th Dist. Clermont No. CA2015-01-003, 2015-Ohio-2318, ¶ 24. Therefore, while Father and Grandmother suggest otherwise, when the focus is on D.E.'s best interest, the juvenile court's decision to grant the guardian ad litem's motion was supported by the facts and circumstances of this case, which includes, among other factors, the foster-parents' clear desire to adopt D.E. if permanent custody was granted to WCCS.

{¶ 52} Father next argues the juvenile court erred by granting the guardian ad litem's motion claiming the juvenile court failed to adequately consider each of the best interest factors as enumerated in R.C. 2151.414(D)(1). Although not explicit, Grandmother also alleges the juvenile court failed to consider the required best interest factors. The record, however, indicates the juvenile court went to great lengths to discuss each of the relevant factors within its detailed 17-page decision. This includes a lengthy discussion regarding D.E.'s interaction and interrelationship with his parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child, as well as D.E.'s wishes, as expressed directly by the child or through the guardian ad litem. Therefore, after a simple review of the record, we find Father and Grandmother's claims

alleging the juvenile court failed to adequately consider each of the best interest factors as enumerated in R.C. 2151.414(D)(1) are simply incorrect.[3]

{¶ 53} Both Father and Grandmother further argue that if legal custody could not be granted to Father, which we find that it could not, the juvenile court should have granted legal custody to Grandmother. A juvenile court "may award legal custody to a nonparent upon a demonstration by a preponderance of the evidence that granting legal custody to the nonparent is in the child's best interest." *In re C.A.*, 12th Dist. Butler No. CA2014-07-165, 2015-Ohio-1410, ¶13. Similar to the best interest analysis under R.C. 2151.414(D), in the context of a motion for legal custody, the juvenile court is required to consider all relevant factors listed under R.C. 3109.04(F) in determining the best interest of a child. *In re L.T.*, 12th Dist. Butler Nos. CA2016-03-048 and CA2016-03-058, 2016-Ohio-5272, ¶ 60. These factors include, but are not limited to (1) the wishes of the child's parents regarding the child's care; (2) the child's interaction and interrelationship with the child's parents, siblings, and any other person who may significantly affect the child's best interest; (3) the child's adjustment to the child's home, school, and community; and, (4) the mental and physical health of all persons involved. R.C. 3109.04(F)(1)(a), (c), (d), and (e).

{¶ 54} Father argues the juvenile court erred by denying Grandmother's motion for legal custody since Grandmother was bonded with D.E., as was D.E. to her. Father also argues the juvenile court erred by denying Grandmother's motion for legal custody because Grandmother had a safe and appropriate home where she was already taking care of D.E.'s four older siblings, all of whom with D.E. was also bonded. Father further argues the

---

3. Both Father and Grandmother appear to argue the juvenile court was at fault for not addressing D.E. personally in order to determine his wishes. However, while it may be true that the juvenile court did not address D.E. personally, at the conclusion of the three-day hearing, D.E. had just turned two years old, thereby making it virtually impossible for D.E. to articulate his wishes despite the fact that he was on track developmentally for a child his age. As the guardian ad litem even stated, "at his age [D.E.] is not able to express his wishes[.]"

juvenile court erred by denying Grandmother's motion for legal custody since Grandmother was "educated, employed, and committed to caring for her grandchildren."

{¶ 55} Similarly, Grandmother claims the juvenile court erred by denying her motion for legal custody because she was a suitable alternative to granting the guardian ad litem's motion for permanent custody. Therefore, according to Grandmother, when taking into consideration her bond with D.E., the fact that she has a "suitable home," as well as her "stable, long term employment," both her and Father's relationship with D.E. "is certainly a family relationship that is worth preserving."

{¶ 56} This is not the typical permanent custody case. However, as the record indicates, Grandmother, who lives in a two-bedroom townhouse, was already overly committed to taking care of D.E.'s four older siblings, all of whom are under the age of ten. Although Grandmother disputes the juvenile court's finding she was overly committed, the record indicates Grandmother specifically testified that it was "beyond" a full-time job to take care of D.E.'s four older siblings. Grandmother also testified that "it just never stops. * * * We don't have time, and, just you know." Therefore, by her own admission, it is clear that adding an additional child like D.E. would do nothing more than create further strain on Grandmother's ability to properly care for not only D.E.'s four older siblings, but also for herself. Grandmother's claim otherwise lacks merit.

{¶ 57} The record also indicates Grandmother failed to follow the prescribed visitation schedule and did not attend any of D.E.'s medical appointments after the juvenile court granted her visitation with D.E. That Grandmother did not attend any of D.E.'s medical appointments is significant given D.E.'s extensive medical issues that require D.E. be given special attention. This includes D.E.'s recent diagnosis with cerebral palsy. Due to Grandmother's taxing schedule with D.E.'s four older siblings, there is significant doubt that D.E.'s needs would be met. Placing D.E. in an environment where D.E. may not receive

the attention he so desperately needs to remain on track in his development would certainly not be in D.E.'s best interest.

{¶ 58} Even if Grandmother had taken full advantage of her time with D.E., which she did not, thereby lending further credence to the testimony that Grandmother did not appear committed to D.E. like she was to D.E.'s four older siblings, the record indicates D.E. exhibited negative behaviors after returning from his visits with Grandmother. For instance, according to D.E.'s foster mother, D.E. would oftentimes return from his visits with Grandmother in a "zombie like state" that took him some time to overcome. The record further indicates Grandmother was argumentative with WCCS regarding D.E.'s care, a fact Grandmother readily admits in her appellate brief. Specifically, as Grandmother stated as part of her brief, it is "clear" from the record that there was some "hostility" and "unnecessary conflicts" between herself and WCCS. We agree.

{¶ 59} Finally, as noted previously, of additional concern to WCCS and this court alike is the fact that Grandmother initially disputed WCCS' reasons for removing D.E. from Mother's care. As one case worker testified, "[i]t is a concern that um, that was not recognized." While there is no dispute that Grandmother later changed her opinion after being shown several photographs of D.E.'s malnourished, frail body taken in the days immediately after D.E.'s removal, Grandmother's initial refusal to accept that D.E. was in need of immediate medical attention calls into question the veracity of Grandmother's claim that she had spent several weeks helping Mother care for D.E. after he was born. Again, as this court noted above, the fact that Grandmother initially disputed WCCS' reasons for removing D.E. from Mother's care is troubling, particularly when considering Grandmother has since been granted legal custody of D.E.'s four older siblings.

## Conclusion

{¶ 60} In light of the foregoing, although this case was closer than most permanent

- 20 -

custody cases reviewed by this court, we nevertheless find no error in the juvenile court's decision granting the guardian ad litem's motion for permanent custody. This is true even though Father and Grandmother love D.E. and have established a clear bond with D.E. Although a strong bond may very well exist, that is but one factor to be considered when determining the best interest of a child in a permanent custody proceeding. *In re A.T.-D.*, 12th Dist. Butler Nos. CA2015-03-059, CA2015-03-060, and CA2015-04-068, 2015-Ohio-2579, ¶ 30. The juvenile court, just like this court, must act in a manner that places D.E.'s best interest above all else. "A child's best interests are served by the child being placed in a permanent situation that fosters growth, stability, and security." *In re Keaton*, 4th Dist. Ross Nos. 04CA2785 and 04CA2788, 2004-Ohio-6210, ¶ 61. The juvenile court's decision in this case does just that. Therefore, because we find no error in the juvenile court's decision to grant the guardian ad litem's motion for permanent custody, thereby denying both Father and Grandmother's motions for legal custody, Father's and Grandmother's assignments of error are without merit and overruled.

{¶ 61} Judgment affirmed.

HENDRICKSON and PIPER, JJ., concur.