**[Cite as *In re A.C.*, 2023-Ohio-2735.]**

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

WARREN COUNTY

| | | |
|---|---|---|
| IN RE: | : | |
| A.C., et al. | : | CASE NOS. CA2023-03-023<br>CA2023-03-024 |
| | : | |
| | | <u>O P I N I O N</u> |
| | : | 8/8/2023 |
| | : | |
| | : | |

APPEAL FROM WARREN COUNTY COURT OF COMMON PLEAS
JUVENILE DIVISION
Case No. 20-D000058; 20-D000059

KL Hurd Law, LLC, and Kenyatta Hurd, for appellant.

Joshua Burns, for Father.

David P. Fornshell, Warren County Prosecuting Attorney, and Kirsten A. Brandt, Assistant Prosecuting Attorney, for appellee.

**HENDRICKSON, P.J.**

{¶ 1} Appellant ("Mother") appeals the decision of the Warren County Court of Common Pleas, Juvenile Division, granting permanent custody of her two children, Tommy and Allie, to appellee, Warren County Children Services ("the Agency").[1] For the reasons

---

1. For privacy and readability, we refer to Mother's children using fictitious names and collectively refer to Tommy and Allie as "the children."

discussed below, we affirm the juvenile court's decision.

## The Parties

{¶ 2}  Mother is the biological mother of the two children at issue in this case, Tommy, born on August 14, 2018, and Allie, born on June 16, 2020.  The children's biological father ("Father") did not appeal the juvenile court's decision granting permanent custody to the Agency and is not a party to this appeal.

{¶ 3}  Tommy and Allie each have special medical needs.  The oldest, Tommy, has severe hemophilia A, a very rare and life-threatening bleeding disorder.  This is a lifelong disease that is controlled with medication, which has been administered to Tommy via a weekly injection since he was six months old.  Until Tommy reaches eight years old, his caregiver will be responsible for administering the injection.  In addition to his hemophilia diagnosis, Tommy also requires occupational and speech therapy, and at one time engaged in the NEO Clinic and Help Me Grow services.

{¶ 4}  Allie, on the other hand, was diagnosed with torticollis as an infant, which occurs when an infant tilts her head to one side or looks only to one side.  Allie also "never found her feet" as an infant, which resulted in gross motor delays.  Allie was behind in rolling, sitting, crawling, and walking, which required physical therapy.  Upon learning to walk, Allie walked on her tip toes (also referred to as "toe walking"), which required correction via braces for her feet and inserts for her shoes, as well as consistent monitoring.  Allie also requires the services of an ophthalmologist, who prescribed glasses for the child, in addition to engaging in physical therapy and occupational therapy.  Like her brother, Allie also engaged in services from Help Me Grow and the NEO Clinic when she was an infant.

## Procedural History

{¶ 5}  Prior to the Agency's involvement in the instant case, the Agency previously

became involved with Mother and Father in August 2018, at the time of Tommy's birth, due to Mother's admitted substance abuse while pregnant. At that time, Mother and Father worked on a voluntary case plan and Tommy was returned to Mother's care.

{¶ 6} Thereafter, in June 2020, the Agency learned that Mother and Allie tested positive for illegal substances, including suboxone and THC, at the time of Allie's birth. Allie was experiencing withdrawal symptoms while at the hospital. Mother admitted to marijuana use, but Allie's cord tested positive for methamphetamines, amphetamines, naloxone, and buprenorphine, and Mother subsequently tested positive for additional substances. As a result of the positive test, the Agency implemented a safety plan with maternal grandmother as the caregiver. A few weeks later, the safety plan was disrupted when maternal grandmother tested positive for suboxone on two occasions without a valid prescription. After the initial positive screen in June 2020, Mother obtained a medical marijuana card and only tested positive for marijuana and suboxone going forward. Father, on the other hand, tested positive for methamphetamines, amphetamines, and buprenorphine regularly, and had never submitted a negative screen for the Agency.

{¶ 7} On August 31, 2020, the Agency filed separate complaints alleging the children were dependent based on the above facts, as well as allegations that Mother did not have a stable residence free of drug users and could not provide an appropriate safety plan monitor. After an emergency shelter care hearing, the children were removed from Mother's care and were placed together in the same foster home. At the time of their placement in the foster home, Allie was two months old and Tommy was two years old.

{¶ 8} After a hearing, the children were removed from maternal grandmother's care and placed in the temporary custody of the Agency. On November 5, 2020, the children were adjudicated dependent. After a dispositional hearing on November 25, 2020, the

Agency was awarded temporary custody of the children and they returned to the foster home where they remained until August 2022.

{¶ 9}   After the children's removal from her care, a case plan was created for Mother with the goal of reunification.  Among other things, the case plan required Mother to engage in a substance abuse assessment and follow all recommendations; complete parenting classes; complete a psychological evaluation and follow all recommendations of that assessment; obtain and maintain stable housing; maintain sufficient employment; and attend the children's various doctors' appointments.  To afford Mother more time to complete her case plan services and reunify with the children, the Agency moved for an extension of temporary custody of the children, which was granted by the juvenile court in August 2021.  The juvenile court granted a second request for an extension of temporary custody in February 2022.

{¶ 10} It is undisputed that Mother engaged in and completed many of the case plan objectives, including completing a substance abuse assessment and remaining sober; as well as completing the parenting classes and maintaining sufficient employment.  In June 2022, and as a result of her progress on the case plan, Mother's parenting time was expanded from once a week for two hours, supervised, to once a week for four hours, unsupervised, at the local YMCA.  Shortly thereafter, in July 2022, the state moved the juvenile court to award legal custody of the children to Mother and to close the case.  The state's motion was based upon Mother's progress on her case plan services.

{¶ 11} In August 2022, after six or seven weeks of unsupervised parenting time, the children were placed with Mother for an in-home trial.  Due to the Agency's concerns regarding Mother's care of the children during the trial period, the Agency terminated the in-home trial and removed the children in early October 2022.  At that point, the children

returned to their foster home and the original trial date regarding the state's motion for legal custody was vacated.

{¶ 12} Shortly thereafter, on October 17, 2022, the Agency moved for permanent custody of Tommy and Allie. On January 23 and February 7, 2023, the juvenile court held a two-day hearing on the Agency's motions. During the hearing, the juvenile court heard testimony from eight witnesses, including Allie's physical therapist, a nurse from the hemophilia clinic Tommy attends, the psychology assistant who conducted Mother's psychological assessment, the children's foster mother, Father, Mother, and the two caseworkers involved in the children's case. The children's court appointed special advocate ("CASA") attended the hearing and filed a report with the juvenile court recommending that permanent custody be granted to the Agency.

{¶ 13} On February 16, 2023, the juvenile court issued a decision granting permanent custody of the children to the Agency. In analyzing the best interest factors, the juvenile court found that the children's only chance at stability is if they are placed in the permanent custody of the Agency. The juvenile court detailed the facts indicating that, although she tries, Mother is simply unable to take care of the children and their special needs. It further found that although there is no question that Mother loves the children, they have needs that she simply cannot satisfy, as her issues are too pronounced to do so. The juvenile court also noted that even if Mother made substantial progress in completing case plan objectives, such an effort is insufficient where Mother has not demonstrated that she is able to provide the continued care and attention the children need. Thus, the juvenile court concluded granting permanent custody to the Agency was in the children's best interest.

**The Appeal**

- 5 -

{¶ 14} Mother now appeals the juvenile court's decisions granting permanent custody of Tommy and Allie to the Agency. Mother raises two assignments of error for review, which we will address together for the ease of discussion.

{¶ 15} Assignment of Error No. 1:

{¶ 16} THE TRIAL COURT ERRED IN FINDING THAT THE CHILDREN COULD NOT BE PLACED WITH MOTHER OR FATHER WTIHIN A REASONABLE TIME AND THAT THEY SHOULD NOT BE PLACED WITH EITHER PARENT.

{¶ 17} Assignment of Error No. 2:

{¶ 18} THE TRIAL COURT ERRED IN FINDING THAT IT IS IN THE CHILDREN'S BEST INTEREST FOR WCCS TO BE GRANTED PERMANENT CUSTODY.

{¶ 19} On appeal, Mother argues the juvenile court erred by granting the Agency permanent custody of Tommy and Allie rather than returning the children to her care. After our review, we disagree with Mother's claim.

{¶ 20} Before a parent's constitutionally protected liberty interest in the care and custody of his or her children may be terminated, the state must prove by clear and convincing evidence that the statutory standards for permanent custody have been met. *In re K.W.*, 12th Dist. Butler No. CA2015-06-124, 2015-Ohio-4315, ¶ 11, citing *Santosky v. Kramer*, 455 U.S. 745, 769, 102 S.Ct. 1388 (1982). An appellate court's review of a juvenile court's decision granting permanent custody is generally limited to considering whether sufficient credible evidence exists to support the juvenile court's determination. *In re M.B.*, 12th Dist. Butler Nos. CA2014-06-130 and CA2014-06-131, 2014-Ohio-5009, ¶ 6. "This court will therefore reverse a juvenile court's decision to grant permanent custody only if there is a sufficient conflict in the evidence presented." *In re L.S.*, 12th Dist. Brown Nos. CA2019-03-001 and CA2019-03-002, 2019-Ohio-3143, ¶ 17, citing *In re K.A.*, 12th Dist.

Butler No. CA2016-07-140, 2016-Ohio-7911, ¶ 10. "However, even if the juvenile court's decision is supported by sufficient evidence, 'an appellate court may nevertheless conclude that the judgment is against the manifest weight of the evidence.'" *In re C.S.*, 12th Dist. Clinton No. CA2020-04-006, 2020-Ohio-4414, ¶ 15, quoting *In re T.P.*, 12th Dist. Butler No. CA2015-08-164, 2016-Ohio-72, ¶ 19.

**{¶ 21}** In determining whether a juvenile court's decision to grant a motion for permanent custody is against the manifest weight of the evidence, an appellate court "'weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered.'" *In re S.M.*, 12th Dist. Warren Nos. CA2018-08-088 thru CA2018-08-091 and CA2018-08-095 thru CA2018-08-097, 2019-Ohio-198, ¶ 16, quoting *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 20. "In weighing the evidence, there is a presumption in favor of the findings made by the finder of fact and evidence susceptible to more than one construction will be construed to sustain the verdict and judgment." *In re M.A.*, 12th Dist. Butler No. CA2019-08-129, 2019-Ohio-5367, ¶ 15, citing *In re C.Y.*, 12th Dist. Butler Nos. CA2014-11-231 and CA2014-11-236 thru CA2014-11-238, 2015-Ohio-1343, ¶ 25.

**{¶ 22}** Pursuant to R.C. 2151.414(B)(1), a juvenile court may terminate parental rights and award permanent custody of a child to a children services agency if the court makes findings pursuant to a two-part test. *In re G.F.*, 12th Dist. Butler No. CA2013-12-248, 2014-Ohio-2580, ¶ 9; *In re A.M.*, 166 Ohio St.3d 127, 2020-Ohio-5102, ¶ 18. First, the juvenile court must find that the grant of permanent custody to the agency is in the best interest of the child, utilizing, in part, the factors set forth in R.C. 2151.414(D). *In re D.K.W.*,

12th Dist. Clinton No. CA2014-02-001, 2014-Ohio-2896, ¶ 21. Second, pursuant to R.C. 2151.414(B)(1)(a) to (e), the juvenile court must find that any of the following apply: (1) the child is abandoned; (2) the child is orphaned; (3) the child has been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period; (4) where the preceding three factors do not apply, the child cannot be placed with either parent within a reasonable time or should not be placed with either parent; or (5) the child or another child in the custody of the parent from whose custody the child has been removed, has been adjudicated an abused, neglected, or dependent child on three separate occasions. *In re C.B.*, 12th Dist. Clermont No. CA2015-04-033, 2015-Ohio-3709, ¶ 10. Only one of these findings must be met to satisfy the second prong of the two-part permanent custody test. *In re A.W.*, 12th Dist. Fayette No. CA2014-03-005, 2014-Ohio- 3188, ¶ 12.

{¶ 23} As it relates to the second prong of the two-part permanent custody test, the juvenile court found the children had been in the temporary custody of the Agency for more than 12 months of a consecutive 22-month period at the time the Agency filed its motion for permanent custody. The juvenile court also found that the children could not be placed with Mother or Father within a reasonable period of time, or should not be placed with them. Mother does not dispute that the children have been in the temporary custody of the Agency for more than 12 months of a consecutive 22-month period but claims the court's "reasonable period of time" finding is unsupported by the record. As noted above, only one of the R.C. 2151.414(B)(1) findings must be met to satisfy the second prong of the two-part permanent custody test. *In re J.N.L.H.*, 12th Dist. Butler No. CA2022-06-063, 2022-Ohio-3865, ¶ 26. As such, because Mother does not challenge the juvenile court's "12 of 22" finding, we need not review the issue further. *In re G.A.*, 12th Dist. Butler No. CA2022-06-063, 2022-Ohio-3865, ¶ 43. However, we note that the record unquestionably establishes

that the "12 of 22" finding was met in this case because the children were removed from Mother's care in August 2020, were adjudicated dependent in November 2020, and the Agency did not move for permanent custody of the children until October 17, 2022, nearly two years after the children were placed in the Agency's temporary custody.

{¶ 24} In light of the above, the only issue remaining is whether an award of permanent custody to the Agency was in the children's best interest. When considering the best interest of a child in a permanent custody case, the juvenile court is required under R.C. 2151.414(D)(1) to consider all relevant factors. *In re D.E.*, 12th Dist. Warren Nos. CA2018-03-035 and CA2018-04-038, 2018-Ohio-3341, ¶ 32. These factors include, but are not limited to: (1) the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child; (2) the wishes of the child, as expressed directly by the child or through the child's guardian ad litem; (3) the custodial history of the child; (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (5) whether any of the factors listed in R.C. 2151.414(E)(7) thru (11) apply in relation to the parents and child. *In re J.C.*, 12th Dist. Brown No. CA2017-11-015, 2018-Ohio-1687, ¶ 22, citing R.C. 2151.414(D)(1)(a) thru (e). The factors in R.C. 2151.414(E)(7) through (11) involve a parent's having been convicted of or pled guilty to specific criminal offenses against the child, the child's sibling, or another child who lived in the parent's household; a parent's withholding of medical treatment or food from the child; a parent's repeatedly placing the child at substantial risk of harm because of alcohol or drug abuse; a parent's abandoning the child; and a parent's having had parental rights as to the child's sibling involuntarily terminated. *In re B.M.*, 12th Dist. Clinton Nos. CA2022-11-028, CA2022-11-029, 2023-

Ohio-1112, ¶ 54

{¶ 25} Based upon its consideration of the R.C. 2151.414 factors, the juvenile court found by clear and convincing evidence that it was in the children's best interest to grant permanent custody to the Agency. On appeal, Mother argues the juvenile court's finding was in error, as the testimony at trial revealed that Mother loves the children and the children love her; that she was attentive to Tommy's special needs; and that the children's regression was due to the abrupt move from foster mother to Mother, not Mother's inability to provide consistent care. Essentially, Mother claims an award of permanent custody was unnecessary as she had made sufficient progress in her case plan services and was able to care for her children.

{¶ 26} After our review of the entire record, we find no merit to Mother's claims. As an initial note, it is well established that "the completion of case plan services alone does not equate to, or necessitate, a finding that the parents have substantially remedied the conditions that caused the removal of the child from the home." *In re R.K.*, 12th Dist. Warren Nos. CA2021-03-027 and CA2021-03-028, 2021-Ohio-3074, ¶ 24, citing *In re S.M.*, 12th Dist. Clermont No. CA2015-01-003, 2015-Ohio-2318, ¶ 24. "[A] parent can successfully complete the requirements of a case plan, but not substantially remedy the conditions that caused the children to be removed, as the case plan is 'simply a means to a goal, but not the goal itself.'" *Id.*, quoting *In re E.B.*, 12th Dist. Warren Nos. CA2009-10-139 and CA2009-11-146, 2010-Ohio-1122, ¶ 30.

{¶ 27} Here, the evidence and testimony presented at the permanent custody hearing revealed that while Mother made substantial progress on her case plan services, she failed to remedy the Agency's primary concerns throughout the case, including the Agency's concerns regarding Mother's inappropriate parenting practices. This is

particularly evidenced by the complete failure of the in-home trial just months prior to the permanent custody hearing.

{¶ 28} As noted above, Allie and Tommy have significant medical needs and Mother was required, by the case plan, to attend the children's medical appointments. Although Mother acknowledges her children's special needs, and claims she can manage and care for those needs, the record reflects otherwise. During the in-home trial, Mother missed several appointments between the two children, one of which was an important comprehensive appointment relating to Tommy's hemophilia medication, treatment, and diagnosis. This appointment also included meetings with Tommy's nutritionist, physical therapist, and social worker. While missing several appointments in a two-month period may be problematic on its own, Mother also failed to reschedule any of the children's appointments without prompting by the Agency. When questioned about the missed appointments during the permanent custody hearing, Mother indicated they were simply "hiccups" in her parenting, suggesting she did not appreciate the possible consequences of her children missing their medical appointments. Despite Mother's lack of urgency regarding the children's various appointments, the record indicates her failure to attend or reschedule Tommy's comprehensive appointment could have led to life-threatening consequences for the child.

{¶ 29} Moreover, although Mother reiterates that she can adequately care for Tommy, and has a positive history in administering his medication, the record reflects Mother did not regularly attend Allie's appointments and was generally unconcerned with Allie's health conditions, including her toe walking. Foster mother and Allie's physical therapist testified that Allie was making great progress with her physical ailments throughout the case, including no longer requiring braces or inserts to correct her toe walking. Despite

this progress, Allie significantly regressed during the in-home trial with Mother, which resulted in Allie toe walking approximately 85 percent of the time. Mother claimed she did not notice the toe walking while Allie was with her, but she would have been unconcerned regardless, as a relative told Mother that she had toe walked as a child. Similarly, Allie's glasses were scratched to the point they were unusable during the in-home trial, but Mother did not schedule an appointment to get new ones.

{¶ 30} Mother also demonstrated an inability to prioritize Tommy's schooling, which had a positive influence on his behavior while in foster care. Despite prompting by the Agency, including preparation of the forms necessary for his enrollment, Mother failed to enroll Tommy into preschool. According to Mother, she missed an appointment to discuss Tommy's IEP, a requirement for his enrollment, and failed to reschedule that appointment notwithstanding communications from the school requesting her to do so. Mother's explanation for failing to reschedule the appointment related to her receipt of spam calls and her belief that Tommy needed to be potty-trained. While we acknowledge that Ohio law does not require children to attend preschool, and that the decision of whether to enroll a child in preschool is in the hands of parents, Mother's failure to re-enroll Tommy in preschool evidences her failure to continue to engage in existing services or treatments that had proven beneficial to her children. Specifically, foster mother testified that Tommy was thriving while enrolled in preschool, it was a positive piece of his routine, and that it provided access to additional speech and occupational therapy resources for the child. Notwithstanding the clearly positive effect of schooling for Tommy, Mother could not finalize his enrollment during the in-home trial. Thus, while Mother is correct that she completed several case plan objectives, the record reflects she demonstrated a general inability to properly care for or adequately parent the children during the two-month in-home trial

period.

{¶ 31} Moreover, although Mother has largely achieved sobriety throughout this case, it is undisputed that Father and her support network struggle with substance abuse. Although Mother was recommended to increase her sobriety network by engaging in community support meetings like SMART Recovery or Narcotics Anonymous, she had not done so by the time of the permanent custody hearing. Rather, the record reflects Mother engaged in a codependent relationship with Father, despite his lack of progress on the case plan and consistent positive drug screens until shortly before the hearing, as well as a codependent relationship with maternal grandmother, who Mother testified struggled with drug use at the time of the permanent custody hearing. As such, notwithstanding Mother's ability to remain sober throughout the case, as well as completing the requisite substance abuse treatment, we question her ability to maintain sobriety given her association with, and codependency upon, known substance abusers.

{¶ 32} We also reject Mother's claim that the Agency rushed the children back into her care and the juvenile court "blamed" Mother for the children's regression during the in-home trial. The testimony at trial revealed the children regressed significantly during their two-month stay with Mother. According to the children's foster mother, Tommy exhibited numerous physical regressions, including gaining 15 pounds, as well as suffering an eczema breakout on his bottom and wounds on his feet that inhibited his ability to walk. Tommy also regressed in his speech, declining to speak in full sentences, and began referring to Allie as "bad baby." The foster mother described Tommy as having a glassy and distant look in his eyes upon his return and as if he had lost his light. With regard to Allie, the foster mother explained that, upon her return, Allie's behavior was "night and day," as she had started disrespecting foster mother, refusing to listen, and behaving like a "wild

woman." Allie also increased her toe walking to 85 percent of the time, which had formerly been reduced to 15 percent of the time.

{¶ 33} While Mother attributes the above behaviors to the Agency's "rushed" approach to returning the children to Mother's full-time care, we simply cannot ignore the apparent physical and emotional regressions suffered by the children while in Mother's care for two months, or their rebound just weeks after returning to their foster mother's care. Moreover, the record reflects Mother's parenting time was increased in length and was unsupervised prior to the in-home trial and that Mother had months of preparation in that she could go to medical appointments and ask questions. Despite this preparation, Mother acknowledged she has trouble controlling the children, and the caseworker testified that home visits during the in-home trial were chaotic and Mother struggled to manage the children during that time.

{¶ 34} The record indicates Allie and Tommy thrive in an environment that is highly structured and stable, which unfortunately, is not an environment Mother can provide for them at this time. Although Mother clearly loves her children and worked to reunify with them, her failure to remedy the conditions that led to the children's removal, as well as her general inability to control and parent the children, demonstrate the lack of stability and structure she can provide for the children. According to the caseworker, the Agency can fix many things, but in this case, Mother's apparent lack of motivation and unwillingness to problem solve cannot be fixed. Mother had many opportunities and resources to assist with her full-time care of the children, but she elected not to take advantage of the assistance available to her. Instead, the record reflects Mother would offer misleading statements regarding her situation to "look better" to the Agency or CASA, while simultaneously failing to provide adequate or stable care for the children. As this court has previously recognized,

"'[a] child's best interests are served by the child being placed in a permanent situation that fosters growth, stability, and security.'" *In re I.C.*, 12th Dist. Clinton Nos. CA2022-04-010 thru CA2022-04-012, 2022-Ohio-3101, ¶ 45, quoting *In re D.E.*, 12th Dist. Warren Nos. CA2018-03-035 and CA2018-04-038, 2018-Ohio-3341, ¶ 60. Mother simply cannot provide such an environment for the children.

{¶ 35} When considering the evidence in the record, it is clear that the juvenile court's decision reflects the concern that these children were in need of safety and stability, which could not be achieved absent the grant of permanent custody. In light of the foregoing, we conclude that it is in the best interest of the children for permanent custody to be awarded to the Agency. As such, we find the juvenile court's decision to grant permanent custody of Allie and Tommy to the Agency was supported by clear and convincing evidence and was not against the manifest weight of the evidence.

{¶ 36} Accordingly, Mother's assignments of error are overruled.

{¶ 37} Judgment affirmed.

M. POWELL, J., and BYRNE, J., concur.

- 15 -