[Cite as *In re K.F.*, 2021-Ohio-1183.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

CLERMONT COUNTY

|  |  |  |
|---|---|---|
| IN RE: | : | |
| K.F. | : | CASE NOS. CA2020-10-061<br>CA2020-10-062 |
| | : | |
| | : | O P I N I O N<br>4/7/2021 |
| | : | |
| | : | |
| | : | |

APPEAL FROM CLERMONT COUNTY COURT OF COMMON PLEAS
JUVENILE DIVISION
Case No. 2017 JC 05032

Mark J. Tekulve, Clermont County Prosecuting Attorney, Nicholas Horton, 76 South Riverside Drive, 2nd Floor, Batavia, Ohio 45103, for appellee

Dever Law Firm, Scott A. Hoberg, 9146 Cincinnati, Columbus Road, West Chester, Ohio 45069, for appellant, father

Grandfather, 202 East Main Street, Batavia, Ohio 45103, pro se

Nathan Bell, 2339 Clermont Center Drive, Batavia, Ohio 45103, guardian ad litem

**BYRNE, J.**

{¶ 1} Appellants, Father and Grandfather, appeal the decision of the Clermont County Court of Common Pleas, Juvenile Division, granting permanent custody of minor child K.F. to appellee, Clermont County Department of Job and Family Services ("the

agency").  For the reasons outlined below, we affirm the juvenile court's decision.

## I. K.F.'s Family

{¶ 2}   The child at issue, K.F. (formerly X.F.), was born in 2015.  Although Father is not K.F.'s biological father, he acknowledged legal paternity and is identified on K.F.'s amended birth certificate.  Grandfather is Father's father, and thus he has no biological relation to K.F.  For a period early in K.F.'s life, K.F. resided with Father and K.F.'s biological mother ("Mother").  Mother did not oppose or appeal the juvenile court's decision to award permanent custody to the agency.

{¶ 3}   K.F.'s biological father is A.C.  The record does not provide any indication that A.C. was ever involved in K.F.'s life.  A.C. did not participate in the permanent custody proceedings and did not appeal the juvenile court's permanent custody determination.  In our description of the procedural history of this case below we will omit references to procedural developments regarding A.C. and Father's putative paternity, noting only that A.C. chose not to participate in these proceedings or in any case plan, and that A.C. never sought custody or visitation.

## II. Procedural History

### A. Complaint, Adjudication, and Disposition

{¶ 4}   Police were dispatched to Mother, Father, and K.F.'s home for a drug complaint on December 21, 2017.  Officers discovered Father sitting on the toilet with his head near the floor, Mother passed out in a closet, and K.F. sleeping on a pile of trash.  K.F. was only two and one-half years old.  The officers requested the agency to respond to the home.

{¶ 5}   Mother was taken to the Clermont County Jail, where she admitted to the agency that she had used heroin the week preceding the agency's involvement and that

K.F. was present when she was using. Father admitted he had used heroin on December 21, 2017. Father continued using illegal drugs until January 2018, when he was incarcerated.

{¶ 6} On December 28, 2017, the agency filed a complaint requesting the juvenile court grant emergency temporary custody of K.F. to the agency, arguing that K.F. was a neglected child as defined by R.C. 2151.03(A)(2). The complaint alleged that, in addition to Mother and Father's drug use and condition on December 21, 2017, Father had overdosed on heroin on December 19, 2017 and December 22, 2017.

{¶ 7} The juvenile court granted the agency's request for emergency temporary custody of K.F. Following his removal from Mother and Father's care, K.F. was initially placed with Grandfather. However, Grandfather requested K.F.'s removal from his care one week later, explaining that he was unable to care for K.F. because of his wife's health. After K.F.'s removal from Grandfather's care, the agency attempted to locate a relative to care for K.F. The agency was unsuccessful in locating any kinship care, and ultimately placed K.F. in a foster home.

{¶ 8} The magistrate issued a decision adjudicating K.F. a neglected child. The juvenile court issued a judgment entry adopting the magistrate's adjudication decision.

{¶ 9} On April 17, 2018, the magistrate held a dispositional hearing. Mother did not appear at the hearing. Father appeared and consented to the agency receiving temporary custody of K.F. The magistrate issued a decision granting temporary custody to the agency, which the juvenile court adopted in its entirety.

{¶ 10} The magistrate also approved and journalized the agency's case plan for Mother and Father. The case plan stated that Mother and Father reported to the agency that they use heroin to cope with their mental health issues. In light of their statements, the

case plan required both parents to complete a mental health assessment and follow through with any treatment recommendations. The case plan also required them to complete drug and alcohol assessments and to follow through with any treatment recommendations. Mother and Father were also required to seek out and apply for appropriate housing, as well as employment opportunities and other sources of income. A visitation plan was set forth in the case plan, which included restricted weekly one or two hours visits with K.F. in an agency setting.

### B. Father's and Mother's Incarceration

{¶ 11} On April 18, 2018, Father was released from jail. A few days later the agency amended the case plan to expand Father's visitation. The expanded visitation allowed Father's visits to be supervised by Grandfather, but required approval from the foster parents. The visits could not exceed a 12-hour period per day and could not include overnight hours.

{¶ 12} Shortly thereafter, in May 2018, Father returned to jail because of his continued illegal drug use. His visits with K.F. continued at the county jail until Father was transferred to prison a few months later. Father's visitation with K.F. was soon restricted by the prison authorities due to Father's violation of the institution's policies, and his last visit with K.F. occurred between October and December of 2018.

{¶ 13} Mother was also reincarcerated in May 2018. Mother was removed from the case plan entirely at that time.

### C. Grandfather's Motion for Visitation and the Agency's Motion for Permanent Custody

{¶ 14} Grandfather was allowed regular visitation with K.F. while K.F. was in the care of his first set of foster parents. According to Grandfather, he had visited K.F. regularly throughout the duration of the case, however, in March 2019, shortly after K.F. was

transferred to the care of a second set of foster parents, K.F.'s second set of foster parents began denying Grandfather's requests to visit. One month after the foster parents' initial denial, Grandfather contacted the agency to reestablish regular visits, and his request was denied.

{¶ 15} On May 22, 2019, Grandfather moved the juvenile court for an order allowing him to continue visits with K.F. Grandfather argued he and K.F. had a longstanding relationship and it would be in K.F.'s best interest for the visits to continue. On July 31, 2019, the magistrate denied Grandfather's motion for visitation. Grandfather filed written objections.

{¶ 16} On August 16, 2019, while Grandfather's motion for visitation was pending, the agency moved for permanent custody of K.F. In support of its motion, the agency alleged K.F. had been in the temporary custody of the agency for 12 or more months of a consecutive 22-month period. The motion further alleged K.F. could not and should not be placed with Mother, Father, or A.C. within a reasonable time. The motion indicated K.F. has been abandoned by Mother, Father, and A.C., and specifically noted that Father was sentenced to a 33-month sentence on September 20, 2018. The agency claimed the best interest of K.F. "shall be served by an award of permanent custody and commitment to the [agency]."

{¶ 17} The juvenile court granted Grandfather's objections to the magistrate's denial of his motion for visitation, joined Grandfather as a party to the action, remanded Grandfather's motion for visitation for trial, and consolidated the trial on the motion for visitation with the trial on the agency's motion for permanent custody.

### D. Witness Testimony at Consolidated Trial

{¶ 18} On December 12, 2019, the juvenile court held a consolidated trial on the

agency's motion for permanent custody and Grandfather's motion for visitation. The trial was held before the juvenile court magistrate. The following is a summary of the testimony offered by five of the witnesses who testified at the December 12, 2019 trial.

### 1. Case Manager's Testimony

{¶ 19} The agency's case manager assigned to K.F.'s case testified she had been involved with the case since January 2018. Her responsibilities as a case manager included working with families on implementing and completing their case plan. She created a case plan for both Mother and Father.

{¶ 20} The case manager explained that Mother had a pending 18-month sentence, as well as two additional criminal matters to address, and was free from incarceration for a period of only six or seven months during this case. Father had been incarcerated at various facilities since May 2018 and was scheduled to be released in March 2020. Father was free from incarceration for only a short period of time, approximately two months, during the pendency of this case. The case manager testified that while some individuals in prison avail themselves of rehabilitation programs while in prison, Father did not do so. As a result of their significant periods of incarceration throughout the case, neither Mother nor Father had completed any terms of their case plan.

{¶ 21} The case manager testified that by the time of trial, Father could only establish he would have suitable housing with Grandfather after Father's release from prison. He received disability payments due to a diagnosis of fetal alcohol syndrome, but he had not been employed throughout the duration of the case. Due to the length of Father's prison sentence, the case manager concluded that Father would not have sufficient time to complete the remaining objectives of his case plan even if he were released in March 2020 as anticipated.

{¶ 22} The case manager described Mother's and Father's visitation with K.F. Mother had visited K.F. only four times during the duration of the case, with the last visit occurring in September of 2019. Father had more consistent visitation with K.F. until he was transferred to prison in late 2018. However, because the prison quickly restricted Father's visitation with K.F. due to a violation of the institution's policies, Father had not seen K.F. in over a year by the time of trial.

{¶ 23} The case manager explained that she had ongoing concerns regarding Father's substance abuse. She noted that on one occasion shortly before Father went back to jail, she observed Father and K.F. alone in the agency's parking lot after a visit. Although Grandfather was supposed to be supervising the visit between K.F. and Father, Grandfather was not present. When the case manager approached Father in the parking lot, she noticed sores on Father's arms and "felt like [Father] was under the influence." When the case manager asked Father why he was sitting out in the parking lot, Father indicated he was concerned about an outstanding warrant issued against him. After discussing her concerns with Father, the case manager spoke with the agency's visitation staff, who had "concerns that mirrored [her] own," namely, that Father "was potentially under the influence on that day."

{¶ 24} The case manager had similar concerns regarding Mother's ongoing substance abuse. At Mother's final meeting with the case manager in October of 2019, the case manager observed similar sores on Mother, which she associated with substance abuse. Mother admitted she had relapsed and that it was her hope that K.F. would remain placed with the agency.

{¶ 25} The case manager also discussed her attempts to place K.F. with a family member prior to his placement in foster care. She inquired with Grandfather, a maternal

aunt, and a biological relative of Father's, however, none of the individuals were a suitable placement for K.F. K.F. was initially placed with Grandfather from December 21 to December 28, 2017, however, Grandfather soon requested removal of the child due to his wife's health complications. The case manager further indicated she had concerns regarding Grandfather's ability to care for K.F., as Father had shared with her that Grandfather had a history of alcoholism.

{¶ 26} On November 5, 2019, two weeks before trial, Grandfather contacted the case manager and requested placement of K.F. The case manager testified that, by that point, the agency had changed K.F.'s case plan goal from reunification with his parents to adoption. According to the case manager, once adoption is the goal of the case plan, any relative who requests placement of the child must be willing and able to adopt the child, as well as complete foster parent training. If Grandfather completed the requisite training, he could proceed through the adoption matching process.

{¶ 27} The day of trial, Father's counsel informed the case manager that Grandfather was willing to take "full, permanent, legal custody" of K.F. However, Grandfather himself never stated, either at trial or beforehand, that he desired legal custody of K.F.

{¶ 28} The case manager also testified regarding her observations of K.F. and his progress while in foster care. Initially the agency believed K.F. was autistic; however, his condition improved in foster care. K.F.'s doctors indicated K.F.'s early behavior, which led to the belief that K.F. was autistic, may have resulted from the neglect he experienced when he lived with Mother and Father. Since entering foster care, K.F. had graduated from speech therapy, was thriving in many ways, was potty trained, and improved his speech significantly. K.F. was a happy child, well-groomed, and comfortable in his foster care environment. The case manager testified K.F. had been in his current foster home since

July 13, 2018, and that his foster parents were interested in pursuing adoption if permanent custody was granted to the agency.

{¶ 29} The case manager also testified regarding threatening statements Father made in relation to K.F.'s foster parents. Upon learning the agency planned to file for permanent custody of K.F., Father told the case manager that he would fight the motion at trial and that he would "make sure" the foster parents never "got" K.F. According to the case manager, Father then stated:

> [The foster parents] will never get [K.F.] I'll make sure of it. I will come back to prison. * * * They can't care for someone when they aren't breathing. I will track them down. * * * It wouldn't be hard to find them. I'll come back to prison before I will let them have [K.F.].

The case manager disclosed Father's statements to the prison authorities.

{¶ 30} On cross-examination, the case manager testified that Father loves K.F. and was tender with him in their interactions. Father's visits with K.F. went smoother than Mother's visits with K.F.; it took time to get K.F. to engage with Mother, as he had not seen Mother in some time and Mother's appearance changed from visit to visit. But despite her acknowledgement that Father loves K.F., the case manager believed permanent custody was in the best interest of K.F. and recommended adoption. She stated: "[T]he sentencing of the parents for their incarnations [sic] makes it impossible for them to work a case plan. I believe that [K.F.] needs permanency. I think that the parents have a long road to sobriety and mental health wellness[.]"

### 2. Foster Father's Testimony

{¶ 31} K.F.'s foster father ("Foster Father") testified that K.F. was a "very happy-go-lucky, loving child," who is eager to learn. K.F. went to daycare five days a week and looked forward to going to daycare each day. The only time K.F. struggled was when his routine

was disrupted. The foster parents enrolled K.F. in taekwondo and soccer. In addition to those activities, K.F. enjoyed activities a typical young boy enjoys, including being outside, going to the park, and going to Kings Island.

{¶ 32} Foster Father explained that the foster parents' network of family and friends loved K.F. and looked forward to seeing him. K.F. spent time with members of their extended family, as well as the foster parents' friends and neighbors.

{¶ 33} Foster Father also testified that the foster parents took care of K.F.'s needs and spent any extra free time with K.F. Foster Father further indicated he intended to restart K.F.'s speech classes, because, although K.F.'s speech had improved significantly since his initial placement with Foster Father, he remained delayed in speech.

{¶ 34} Foster Father testified that the foster parents were committed to K.F., had the ability and desire to meet K.F.'s needs, and intended to adopt K.F. if permanent custody were granted to the agency.

{¶ 35} On cross-examination, Foster Father testified he believes it is very important for K.F. to know both of his biological parents, A.C. and Mother, as Foster Father knew K.F. would eventually have questions that only they could answer. Foster Father indicated Mother would have to be clean prior to developing any relationship with K.F. But Foster Father was hesitant to agree that Father could have contact with K.F. in the future. Foster Father expressed concerns regarding any future relationship between K.F. and Father due to Father's threats to kill the foster parents. However, he agreed he would respect and follow any court order he received regarding K.F.'s visitation.

{¶ 36} Foster Father explained that he insisted visitation between Grandfather and K.F. cease after Father made his verbal threat. He was also uncomfortable with Grandfather visiting with K.F. because he discovered that Grandfather was not taking K.F.

to see Father as Grandfather had indicated, but was engaging in other activities with K.F. Foster Father viewed Grandfather's statements about what he would be doing with K.F. on their visits as dishonest.

### 3. Adoption Supervisor's Testimony

{¶ 37} An adoption supervisor with Clermont County Children Services testified regarding how the adoption matching process would proceed if the juvenile court granted permanent custody to the agency. She noted that qualified individuals other than the foster parents could apply to adopt K.F. but noted that K.F. had already resided with the foster parents for the requisite six-month period.

### 4. Father's Testimony

{¶ 38} Though still incarcerated, Father was allowed to testify at trial. Father testified that he was not in agreement with granting permanent custody to the agency and that he did not believe it was in K.F.'s best interest to terminate Father's parental rights. Father indicated all alternatives should be investigated before a decision regarding K.F.'s custody could be made. According to Father, he had not had the chance to prove whether he was a fit or unfit placement for K.F. due to his incarceration, and he urged the juvenile court to afford him the same opportunity as "everybody else" to prove his fitness once he was released from prison.

{¶ 39} Father testified he would agree to granting legal custody to the foster parents if he was allowed to maintain visitation rights and some of his parental rights. He wished to remain in K.F.'s life because K.F. may eventually have questions that only Father can answer, as he had been in K.F.'s life since K.F. was an infant. Despite his desire to remain in K.F.'s life, Father noted the foster parents had provided "wonderful care for [K.F.]," and that K.F. seemed to be happy with his foster parents. Father concluded that, "it's in [K.F.'s]

best interest" for the foster parents to receive legal custody of K.F. "if he's happy there;" however, Father "just would like to be in [K.F.'s] life."

{¶ 40} Father testified that he became aware he was not K.F.'s biological father in May or June of 2018. However, that discovery did not change anything for him. By that point he had already developed a bond with K.F. Due to their bond, Father desired a chance to remain in K.F.'s life. Father noted that he had been adopted by Grandfather, and so he may be in a better position than others to help K.F. understand that a biological relation is not required for a loving family relationship. When questioned about the case manager's description of his comments threatening the foster parents, Father testified his statements were misinterpreted by the case manager. Father indicated that his statements merely meant that he intended to legally fight against the permanent custody motion, and that he refused to "sign off on" permanent custody without a fight. He declined to say anything further on the topic to the case manager as he did not want to incriminate himself.

{¶ 41} Father testified that, although he had been in prison for much of the case, he never missed a scheduled visit with K.F. This included weekly or bi-weekly visits with K.F. at the county jail from May 2018 until August 2018. Father further indicated that his visits with K.F. always went well and that K.F.'s assigned guardian ad litem stated she could tell Father had genuine love for K.F. Father also indicated he had engaged in case plan services while in prison, including completing drug treatment and remaining sober since the beginning of his incarceration despite easy access to drugs in prison. He was pursuing a Chemical Dependency Counselor's Assistant certification. Despite his purported engagement in drug treatment, Father could not recall whether he had discussed his progress with the agency's case manager.

{¶ 42} Father admitted that, upon his release from jail in April 2018, he continued

abusing illegal substances, which resulted in his return to jail in May 2018. He also admitted that while he was free from custody between April to May 2018 he did not engage in any case plan services.

{¶ 43} Father indicated he was scheduled to be released from prison in March of 2020. His plans upon release were undetermined because he did not know his future parole status or whether he would be required to go to a halfway house. In general, Father intended to cut off most people he associated with, to try to get a job at a local restaurant, and to try to fill some of his time to prevent boredom, which he said contributed to his substance abuse. Father also testified he believed he could maintain sobriety upon his release because he felt "like [he's] over it." He hoped to eventually become a drug counselor.

{¶ 44} Father further testified that, if the juvenile court did not grant permanent custody of K.F. to the agency, he intended to follow "every step to the case plan" upon his release from prison. He stated that he had had two years to think about the mistakes he had made and realized he did not want to live the same life anymore. Father testified he believed he could provide for K.F.'s emotional support, financial support, and special needs. Grandfather would pay for his housing, and he would receive steady income in the form of his fetal alcohol syndrome disability benefits.

### 5. Grandfather's Testimony

{¶ 45} Grandfather testified he and K.F. had an interesting relationship and that he had visited with K.F. regularly since K.F. lived with Mother and Father. Grandfather summarized the various activities he and K.F. engaged in during their visits, including going to the park, going swimming, and playing outside, and further stated that K.F. enjoyed their visits together. Grandfather regularly visited with K.F. when he was placed with his first

foster family, then he continued to visit with K.F. after K.F. was placed with his current foster parents in July 2018. Grandfather believed he and the new foster parents had developed a good relationship, as he would pick up K.F. from daycare on occasion, and visited with K.F. in accordance with the foster parents' schedules.

{¶ 46} Grandfather was surprised when Foster Father would no longer allow Grandfather to visit with K.F. after Father threatened the foster parents. He pointed out that the bad behavior was Father's behavior, not his behavior. Grandfather also testified that he would honor any restriction on his visitation with K.F., including preventing Father from seeing K.F. Addressing Foster Father's allegation that he had lied about what he was doing with K.F. during visitation, Grandfather testified that there had simply been miscommunications between the foster parents and him.

{¶ 47} Grandfather clarified that "as far the visitation motion is concerned," he was not asking for much – just an opportunity to visit with K.F. once or twice a month. Grandfather believed maintaining the grandparent relationship was in K.F.'s best interest. Grandfather never referred to any desire to obtain legal custody of K.F. He also failed to mention his wife's health issues or the status of those health issues.

### E. Juvenile Court's Decision

{¶ 48} On January 24, 2020, the magistrate granted the agency's motion for permanent custody. The magistrate noted the primary obstacle to K.F.'s reunification with the parents was their incarceration, in addition to their failure to make progress on their case plans when they were free from custody. The magistrate also noted Father's ongoing substance abuse and concluded that although Father sought additional time to prove that he can be a good parent, he was out of time.

{¶ 49} In the same written decision, the magistrate also denied Grandfather's motion

for visitation. The magistrate determined that now that permanent custody had been granted to the agency, K.F.'s familial relationship with Grandfather had ended, and the wishes of the agency and foster parents carried special weight. At that time, neither the agency nor the foster parents believed visitation with Grandfather was in K.F.'s best interest.

{¶ 50} Father and Grandfather objected to the magistrate's decision. The juvenile court overruled their objections and affirmed the magistrate's decision in its entirety. Father and Grandfather appealed.

### III. Appeal

{¶ 51} Father raises a single assignment of error for our review:

{¶ 52} IN A CHILD CUSTODY CASE, THE TRIAL COURT ERRED IN ITS DECISION AND ORDER GRANTING PERMANENT CUSTODY OF THE CHILD TO THE AGENCY DESPITE THE MANIFEST WEIGHT OF THE EVIDENCE THAT LEGAL CUSTODY TO PATERNAL GRANDFATHER OR FOSTER PARENTS WAS IN THE CHILD'S BEST INTEREST.

{¶ 53} In support of his assignment of error, Father argues the juvenile court's decision finding it was in K.F.'s best interest to grant permanent custody to the agency was not supported by sufficient evidence and was against the manifest weight of the evidence. Grandfather also appeals but does not raise any additional arguments in his brief. Instead, Grandfather adopts and incorporates Father's appellate brief as his own.[1]

### A. Permanent Custody Standard of Review

{¶ 54} Before a natural parent's constitutionally protected liberty interest in the care and custody of his or her child may be terminated, the state is required to prove by clear and convincing evidence that the statutory standards for permanent custody have been

---

1. Father and Grandfather make no arguments and bring no assignments of error on appeal regarding the juvenile court's denial of Grandfather's motion for visitation. Because the entirety of Father and Grandfather's argument relates to the juvenile court's decision to grant the agency's motion for permanent custody, we will not address the juvenile court's decision to deny Grandfather's motion for visitation.

met.  *In re K.W.*, 12th Dist. Butler No. CA2015-06-124, 2015-Ohio-4315, ¶ 11, citing *Santosky v. Kramer*, 455 U.S. 745, 759, 102 S.Ct. 1388 (1982).  An appellate court's review of a juvenile court's decision granting permanent custody is generally limited to considering whether sufficient credible evidence exists to support the juvenile court's determination.  *In re M.B.*, 12th Dist. Butler Nos. CA2014-06-130 and CA2014-06-131, 2014-Ohio-5009, ¶ 6.  This court will therefore reverse a juvenile court's decision to grant permanent custody only if there is a sufficient conflict in the evidence presented.  *In re K.A.*, 12th Dist. Butler No. CA2016-07-140, 2016-Ohio-7911, ¶ 10.  However, even if the juvenile court's decision is supported by sufficient evidence, "an appellate court may nevertheless conclude that the judgment is against the manifest weight of the evidence."  *In re T.P.*, 12th Dist. Butler No. CA2015-08-164, 2016-Ohio-72, ¶ 19.

{¶ 55} In determining whether a juvenile court's decision is against the manifest weight of the evidence in a permanent custody case, an appellate court "'weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered.'"  *In re S.M.*, 12th Dist. Warren Nos. CA2018-08-088 thru CA2018-08-091 and CA2018-08-095 thru CA2018-08-097, 2019-Ohio-198, ¶ 16, quoting *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 20.  The presumption in weighing the evidence is in favor of the finder of fact, which we are especially mindful of in custody cases.  *In re C.Y.*, 12th Dist. Butler Nos. CA2014-11-231 and CA2014-11-236 thru CA2014-11-238, 2015-Ohio-1343, ¶ 25.  Therefore, "[i]f the evidence is susceptible to more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment."

*Eastley* at ¶ 21.

## B. Two-Part Permanent Custody Test

{¶ 56} Pursuant to R.C. 2151.414(B)(1), the juvenile court may terminate a parent's parental rights and award permanent custody of a child to a children services agency if the court makes findings pursuant to a two-part test. *In re G.F.*, 12th Dist. Butler No. CA2013-12-248, 2014-Ohio-2580, ¶ 9. First, the juvenile court must find that the grant of permanent custody to the agency is in the best interest of the child, utilizing, in part, the factors of R.C. 2151.414(D). *In re D.K.W.*, 12th Dist. Clinton No. CA2014-02-001, 2014-Ohio-2896, ¶ 21. Second, pursuant to R.C. 2151.414(B)(1)(a) to (e), the juvenile court must find that any of the following apply: (1) the child is abandoned; (2) the child is orphaned; (3) the child has been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period; (4) where the preceding three factors do not apply, the child cannot be placed with either parent within a reasonable time or should not be placed with either parent; or (5) the child or another child in the custody of the parent from whose custody the child has been removed, has been adjudicated an abused, neglected, or dependent child on three separate occasions. *In re C.B.*, 12th Dist. Clermont No. CA2015-04-033, 2015-Ohio-3709, ¶ 10. Only one of these findings must be met to satisfy the second prong of the two-part permanent custody test. *In re A.W.*, 12th Dist. Fayette No. CA2014-03-005, 2014-Ohio-3188, ¶ 12.

### 1. 12 Months of a Consecutive 22-Month Period

{¶ 57} We can quickly dispense with the second part of the two-part permanent custody test. The juvenile court found that K.F. had been in the agency's custody for 12 or more months of a consecutive 22-month period, satisfying R.C. 2151.414(B)(1)(d). Neither Father nor Grandfather challenge this finding on appeal.

## 2. Best Interest of the Child

{¶ 58} Turning back to the first part of the two-part permanent custody test, we now examine whether the trial court erred when it determined that it was in K.F.'s best interest for the agency to be awarded permanent custody.

## a. Best Interest Standard

{¶ 59} When considering the best interest of a child in a permanent custody case, the juvenile court is required to consider certain enumerated factors under R.C. 2151.414(D)(1). *In re D.E.*, 12th Dist. Warren Nos. CA2018-03-035 and CA2018-04-038, 2018-Ohio-3341, ¶ 32. These factors include, but are not limited to:

> (a) [t]he interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
>
> (b) [t]he wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
>
> (c) [t]he custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state;
>
> (d) [t]he child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; [and]
>
> (e) [w]hether any of the factors listed in R.C. 2151.414(E)(7) to (11) apply in relation to the parents and child.

R.C. 2151.414(D)(1). "The juvenile court may also consider any other factors it deems relevant to the child's best interest." *In re A.J.*, 12th Dist. Clermont No. CA2018-08-063,

2019-Ohio-593, ¶ 24, citing *In re N.R.S.,* 3d Dist. Crawford Nos. 3-17-07 thru 3-17-09, 2018-Ohio-125, ¶ 15 ("[t]o make a best interest determination, the trial court is required to consider all relevant factors listed in R.C. 2151.414[D], as well as any other relevant factors").

### b. Best Interest Analysis

### i. Interaction and Interrelation of K.F with Mother, Father, Grandfather, and K.F.'s Second Foster Family

{¶ 60} With respect to R.C. 2151.414(D)(1)(a), the juvenile court considered the interaction and interrelationship of K.F. with A.C., Mother, Father, Grandfather, and his second foster family.

{¶ 61} The juvenile court found that K.F. had no relationship with his biological father, A.C. The juvenile court found that Mother failed to maintain a relationship with K.F. throughout the pendency of this case, having only visited K.F. four times in more than two years. In contrast, the juvenile court found that Grandfather loves K.F. very deeply and continued to visit K.F. when permitted.

{¶ 62} Regarding Father, the juvenile court found that while Father had acted appropriately and lovingly with K.F. during their visits, the juvenile court agreed with the magistrate's finding that "visits in jail do not engender a normal father-son relationship. Being locked up for most of the time, [Father] could not go to the park, have meals with the child, or do any other typical activities that help cement the parent-child bond." Thus, although Father had been present in K.F.'s life since he was an infant and visited with the child on a regular basis before Father was transferred from jail to prison, the juvenile court found Father could not hone his parenting skills in such an environment. The juvenile court also noted that on at least one occasion when Father visited with K.F. outside of jail, he appeared to be under the influence.

{¶ 63} Father argues the juvenile court did not give enough weight to his relationship and bond with K.F., as demonstrated by the agency's decision to at one point expand his visitation with K.F., as well as his belief that he understands K.F.'s emotional state better than others due to his upbringing by a non-biological parent. We disagree.

{¶ 64} The record reflects the juvenile court considered Father's love for and bond with K.F. but found his inability to develop a normal father-son relationship with K.F. while in prison weighed against Father. Father's incarceration and substance abuse issues limited his involvement with K.F. throughout much of K.F.'s life. Although Father visited with K.F. when he could, those visits primarily took place in the county jail, and were not conducive to maintaining or fostering any normal parent-child relationship with K.F. While the record reflects the agency expanded Father's visitation with K.F. at one point, Father could only exercise that expanded visitation for a few weeks before reentering jail due to his ongoing substance abuse. Moreover, after Father threatened K.F.'s foster parents, his visitation with K.F. was terminated and, as a result, Father had not seen K.F. since October or December of 2018, approximately one year before trial. Due to K.F.'s young age, one year is a significant portion of his life. While Father believes he understands K.F. better than anyone else, the record reflects that their relationship was far less than ideal, and that Father's incarceration—the result of his own behavior—did not allow him to develop or maintain a strong bond with K.F.

{¶ 65} The juvenile court contrasted Father's troubled relationship with K.F. and inability to provide for K.F. with K.F.'s more positive relationship with the second set of foster parents. The juvenile court found that K.F.'s foster parents had provided a home for K.F. since July 2018 and had served his needs well. The juvenile court further found K.F.'s vocabulary and ability to communicate had increased dramatically since arriving at the

foster home, and that his foster parents engage in educational, physical, and social activities with K.F. in their free time. The juvenile court also noted that K.F. enjoyed visiting with his foster parents' extended families and their neighbors. The juvenile court found K.F. had "broken out of his shell" while living in his current foster home.

{¶ 66} We find no error in the juvenile court's weighing of the evidence regarding K.F.'s interaction and interrelation with the individuals described above.

### ii. K.F.'s Wishes

{¶ 67} With respect to R.C. 2151.414(D)(1)(b), the juvenile court found that K.F. was too young to express his wishes in a meaningful manner. However, the juvenile court noted that K.F.'s guardian ad litem had recommended in her report that permanent custody be awarded to the agency and that K.F. had expressed contentment with his current foster family.

{¶ 68} Father argues the juvenile court should have considered his bond with K.F. as evidence of K.F.'s wishes. We find no merit to Father's argument, as the record indicates the juvenile court considered Father's bond with K.F. before granting permanent custody to the agency and R.C. 2151.414(D)(1)(b) expressly allows the juvenile court to consider K.F.'s statements to the guardian ad litem when determining K.F.'s wishes. When considering K.F.'s age, we find no error in the weight the juvenile court gave to the guardian ad litem's assessment of K.F.'s contentment with his foster family. *In re J.P.*, 12th Dist. Butler Nos. CA2011-01-014, CA2011-02-031 and CA2011-04-071, 2011-Ohio-3332, ¶ 69 ("the weight to be given to a guardian ad litem report is always within the prerogative of the trial court"); see also *In re D.K.*, 9th Dist. Summit No. CA 29857, 2021-Ohio-6821, ¶ 20-21 (relying on guardian ad litem's testimony recommending permanent custody where the four-year-old autistic child was unable to express his wishes).

### iii. Custodial History of K.F.

{¶ 69} With respect to R.C. 2151.414(D)(1)(c), the juvenile court considered K.F.'s custodial history, and found K.F. had been in the temporary custody of the agency for a period of 12 or more months of a 22-month period. As noted above, Father does not dispute this finding on appeal.

### iv. K.F.'s Need for a Legally Secure Placement

{¶ 70} With respect to R.C. 2151.414(D)(1)(d), the juvenile court found K.F. has a need for permanence in his life and that a permanent solution for K.F. has been delayed long enough. While the juvenile court noted that Father was due to be released from prison and that he had participated in a drug program while he was incarcerated, the juvenile court ultimately concluded that Father failed to demonstrate to the court that he could care for the child on his own or stay clean and sober outside the walls of an institution. The juvenile court indicated that, despite Father's loving behavior towards the child during visitation sessions, Father had no recent experience taking care of K.F. on a daily basis and he did not have knowledge of K.F.'s needs.

{¶ 71} The juvenile court further found that Father's claims regarding the agency working against him were unsupported by the evidence presented at trial. Rather, the juvenile court found that Father had acted against his own interest by continuing to engage in illegal substance abuse, as opposed to working on his case plan. The juvenile court also noted that by the time of trial Father still had "far to go before he reunified with the child," as there was no indication Father had engaged in any parenting classes or addressed the mental health aspect of his case plan. The juvenile court had concerns pertaining to Father's inability to elaborate on his plan to maintain sobriety upon release.

{¶ 72} The juvenile court further noted that even if Father were to begin engaging in

the case plan services set forth above, the agency was under no obligation to request a further extension of this case. According to the juvenile court, even with an extension of time, there was no evidence Father would be able to work on his case plan within a definite period of time.

{¶ 73} On the other hand, the juvenile court found the foster parents were ready, willing, and currently demonstrating their ability to provide K.F. with a safe, secure, and stable home environment. Considering the foster parents' willingness to adopt K.F. if permanent custody was granted to the agency, the juvenile court concluded it was in K.F.'s best interest to stay with the foster parents.

{¶ 74} Father argues that the juvenile court erred in failing to consider granting legal custody to Grandfather or the foster parents, or other reasonable alternatives. However, it is well settled that a nonparent who seeks legal custody of a child must file a motion for legal custody pursuant to R.C. 2151.353(A)(3). See *In re L.R.T.*, 12th Dist. Butler Nos. CA2005-03-071 and CA2005-04-082, 2006-Ohio-207, ¶ 17 (stating that "[b]ecause appellee failed to file a motion requesting legal custody of L.R.T. at least seven days before the dispositional hearing, the trial court erred as a matter of law in awarding legal custody to her," and noting that compliance with procedural requirements of R.C. 2151.353 and Juv.R. 34 "is mandatory"); *In re L.T.*, 12th Dist. Butler Nos. CA2016-03-048 and CA2016-03-058, 2016-Ohio-5272, ¶ 23 (finding that nonbiological father figure lacked standing in part because he failed to file a motion for legal custody), citing *In re J.P.*, 12th Dist. Butler Nos. CA2015-08-160 and CA2015-08-161, 2016-Ohio-7, ¶ 8 ("Pursuant to R.C. 2151.353(A)(3), a motion for legal custody must be filed prior to the dispositional hearing"). Here, the record indicates neither Grandfather nor the foster parents filed a motion

requesting legal custody of K.F.[2]  As a result, the possibility of granting legal custody to either Grandfather or the foster parents was not before the juvenile court and is not before us.

{¶ 75} While Grandfather allegedly desired legal custody of K.F. by the time of trial, we agree with the juvenile court magistrate's determination that "[i]n light of [Grandfather's] previous unwillingness to provide permanency, his eleventh hour (sic) offer * * * is not reliable indicia of legally secure permanency."  Presumably, if Grandfather had the means and ability to care for K.F. permanently, he would have requested or accepted placement of the child sooner than the day of trial—and he would have mentioned a desire to obtain legal custody of K.F. during his testimony, which he did not.

{¶ 76} By the time Grandfather purportedly sought legal custody of K.F., the agency had changed the goal of the case plan from reunification to adoption.  The case manager explained to Grandfather that an ability to adopt K.F. was required in order to receive custody of K.F. at that point.  There is no evidence in the record that Grandfather intended or desired to adopt K.F. at the time of trial, or that he had completed the foster training as required by the agency.  Furthermore, there is no evidence in the record that Grandfather's wife's medical problems, which made Grandfather unable to care for K.F. in the past, had been resolved.  These health problems had led Grandfather to decline placement of K.F.

---

2. Father argues that the juvenile court considered Grandfather's motion for visitation to be a motion for legal custody.  After a review of the record, we disagree.  Although the magistrate referred to Grandfather's motion for visitation as a "motion for custody" on one single occasion at the start of the trial, the record in its entirety reveals the juvenile court only considered Grandfather's motion to be a motion for visitation.  Notably, the juvenile court applied R.C. 3109.051 to Grandfather's motion and consistently referred to the motion as a motion for visitation in its written decision.  When considering the record as a whole, it is clear the juvenile court did not consider Grandfather's motion as a motion for legal custody of K.F., and the magistrate apparently simply misspoke on the one occasion when he used the phrase "motion for custody."  See *In re N.F.*, 9th Dist. Summit No. CA29508, 2020-Ohio-2701, ¶ 14 (finding a magistrate's misstatement on the record was immaterial, as "it is fundamental that a trial court speaks through its journal entries, not through oral pronouncements made during a hearing").  This conclusion is further supported by Grandfather's own testimony at trial and his oral argument at the hearing on Father's and Grandfather's objections to the magistrate's decision; in both instances Grandfather explicitly stated that he only sought visitation.

with him on multiple occasions in the past, and to request K.F.'s removal after only one week in his care in 2017. Thus, the record indicates granting custody to Grandfather was not a reasonable alternative to permanent custody, even if Grandfather had filed a motion for legal custody, which he did not.

{¶ 77} We also reject Father's argument that he could provide a safe and secure long-term placement for K.F. after his release from prison. While the record reflects Father loves K.F., we find there is no evidence in the record that Father could provide K.F. with the stable and nurturing environment K.F. requires to be successful.

{¶ 78} Father argues the juvenile court failed to consider his progress on the case plan. Father indicates he participated in drug treatment in prison, and that he would have adequate housing and income upon his release. While it may be true that Father had made progress in some areas of the case plan, "the key concern is not whether the parent has successfully completed the case plan, but whether the parent has substantially remedied the concerns that caused the child's removal from the parent's custody." *In re S.M.*, 12th Dist. Clermont No. CA2015-01-003, 2015-Ohio-2318, ¶ 24. Here, the case plan services were implemented to enable Father to demonstrate his ability to safely care for K.F. and to meet his needs. This included Father's ability to remedy his substance abuse problem, which caused K.F.'s removal in 2017. According to the record, Father failed to provide the juvenile court with any evidence that he could care for K.F. upon his release from custody, nor could he articulate any plan for remaining sober and providing for K.F. if permanent custody were not granted to the agency.

{¶ 79} Although Father testified he is "over it"—meaning "over" his substance abuse problem—a juvenile court is not required to deny a permanent custody motion "simply based upon the groundless speculation that the [father] might * * * remain drug-free." *In re*

*A.J.*, 2019-Ohio-593 at ¶ 42. This is because, as this court has stated previously, "when dealing with the life of a young child, such as the case here, the juvenile court cannot, and should not, blindly accept one's claims of self-healing without some type of verification." *Id.*, citing *In re J.C.*, 12th Dist. Brown No. CA2017-11-015, 2018-Ohio-1687, ¶ 29.

{¶ 80} Lastly, we are unpersuaded by Father's argument that the agency lacked sufficient information regarding the status of Father's treatment and self-rehabilitation. The record reflects that during the period Father was not incarcerated, he reengaged in substance abuse, did not participate in case plan services, and was suspected of being under the influence during a visit with K.F. Thus, although the agency may have been unaware that Father participated in drug treatment in prison, we find his participation in a single program does not outweigh his demonstrated inability to remain sober outside of an institution, especially when Father has provided no documentary or testimonial evidence regarding the effectiveness of his drug treatment in prison other than his own assertion that he is "over" his substance abuse problem. Furthermore, participation in a drug treatment program does not negate the fact that Father has failed to address the agency's concerns regarding his mental health and failed to complete parenting education, as required by the case plan. As a result, we find the agency was sufficiently aware of Father's lack of progress in case plan services.

{¶ 81} We acknowledge that Father was incarcerated for much of this case, and this limited his ability to work on his case plan. But Father was in prison due to his actions and his actions alone, and Father must deal with the repercussions of his actions both inside and outside of prison. That includes the possibility of losing custody of K.F. permanently. "A parent is afforded a reasonable, not an indefinite, period to remedy the conditions causing the child's removal." *In re W.J.T.*, 12th Dist. Butler No. CA2019-03-047, 2019-

Ohio-3051, ¶ 41. The juvenile court correctly concluded that the evidence did not establish that Father had remedied the conditions leading to K.F.'s removal.

{¶ 82} The record reflects K.F. was approximately two and one-half years old when the agency removed him from his parents' custody. On the date the trial commenced, K.F. had been out of Mother and Father's custody for nearly two years and had been residing with his current foster parents for one and one-half years. Since his placement in his current foster home, his foster parents provided a stable and secure environment for K.F. This included providing resources to address K.F.'s special needs and alleviating the agency's concerns regarding K.F.'s potential autistic diagnosis. According to Foster Father and the case manager, K.F.'s success in his foster home could be attributed to the routine he had developed over the previous one and one-half years. The juvenile court credited much of K.F.'s improvement to his foster parents' care and dedication to K.F.'s social, educational, and physical development. The record reflects K.F.'s foster parents are committed to raising him and worked hard to alleviate K.F.'s behavioral and social issues. This includes adequately caring for K.F.'s special needs, and ensuring those special needs were sufficiently addressed through schooling and extracurricular programs. Thus, the greater weight of the evidence supports the juvenile court's conclusion that K.F. would benefit from a permanent placement with his foster parents.

{¶ 83} Accordingly, the weight of the evidence establishes K.F. needed a legally secure placement, and that such a placement could not be provided without granting permanent custody to the agency.

### v. R.C. 2151.414(E)(7) to (11) Factors

{¶ 84} The juvenile court found that Mother had abandoned K.F. as defined in R.C. 2151.011(C). This finding is supported by the weight of the evidence and is not challenged

by Father on appeal.

## IV. Conclusion

{¶ 85} The juvenile court, just like this court, must act in a manner that places K.F.'s best interests above all else. "'A child's best interests are served by the child being placed in a permanent situation that fosters growth, stability, and security.'" *In re D.E.*, 12th Dist. Warren Nos. CA2012-03-035 and CA2018-04-038, 2018-Ohio-3341, ¶ 60, quoting *In re Keaton*, 4th Dist. Ross Nos. 04CA2785 and 04CA2788, 2004-Ohio-6210, ¶ 61. The juvenile court's decision to grant permanent custody to the agency in this case does just that.

{¶ 86} The juvenile court did not lose its way in granting permanent custody of K.F. to the agency. The juvenile court carefully considered the evidence as it related to each of the best interest factors in R.C. 2151.414(D)(1) and the juvenile court's findings are supported by the record. After carefully reviewing the record in this case, we find the juvenile court's findings are supported by sufficient, credible evidence and are not against the manifest weight of the evidence. K.F. needs permanency and cannot wait for Father to resolve his issues. A grant of permanent custody to the agency, where K.F. can be adopted by a family that can provide for his needs, is the only solution.[3] Father's and Grandfather's sole assignment of error is overruled.

{¶ 87} Judgment affirmed.

PIPER, P.J., and S. POWELL, J., concur.

---

3. Our opinion should not be interpreted as providing any direction regarding the potential adoption of K.F. by his current foster parents or anyone else who may seek to adopt K.F. The adoption process has not been completed and this appeal only concerns the award of permanent custody to the agency.